## THE PACIFIC RAILROAD v. THE GOVERNOR.*

23   353
37a  516
23   353
120  437
23   353
131  134
23   353
72a  622
72a  629

1. Under an application for a mandamus to the governor, requiring him to issue the bonds of the state to a railroad company under a law alleged by him to have been passed by the general assembly over his veto without the observance of the forms prescribed by the constitution, a majority of the court concurred in sustaining jurisdiction of the application, and passing upon the validity of the law, reserving the question of power to mandamus the governor for the final hearing upon the return to a conditional writ. (Judge LEONARD dissenting.)

2. The validity of an enrolled statute, authenticated in the manner pointed out by law, by the certificate of the presiding officers of the two houses of assembly that it passed over the governor's veto by the constitutional majority, can not be impeached by the journals showing a departure from the forms prescribed by the constitution in the reconsideration of the bill.

Application for a mandamus to Sterling Price, governor of the state of Missouri, requiring him to deliver to the Pacific Railroad Company eight hundred bonds of the state, under an act entitled "An act to secure the completion of certain railroads in this state," passed over the governor's veto on the 10th of December, 1855. The governor refused to issue the bonds on the ground that the law was unconstitutionally passed. An agreed case was made, the substance of which is stated in the opinion of the court. The act referred to was deposited with the laws in the office of the secretary of state, authenticated in the manner pointed out by the first section of the second article of the act concerning laws (R. C. 1845). The matter was argued by T. T. Gantt and H. R. Gamble on behalf of the

---

* This case was prepared for the press by Mr. SAMUEL A. BENNETT, former Reporter.

Railroad, and by Mr. Gardenhire, attorney general, on behalf of the governor.

Mr. *Gamble* argued the following points :

I. This court has jurisdiction of every application for a mandamus, although it may refuse to issue the writ where the applicant has no legal interest in the performance of the duty, or has another adequate remedy against the officer, or the officer has a discretion in relation to the duty to be performed. The power to issue the writ to the governor is not to be denied because he is an officer of the executive department of the government, nor because his office is established by the constitution. (Marbury v. Madison, 1 Cranch.) The argument of the attorney general, in the case of Stockton and others v. Kendall, (12 Pet.) conceded that any officer, even the president, might be obliged, by mandamus, to perform an act purely ministerial.)

II. The act in question is so presented to the court in the agreed case, with the signatures of the officers of the assembly, that it can not be questioned ; and the journals are not to be referred to for the purpose of impeaching it. (Upon this point, the counsel argued that, in the absence of any constitutional provision on the subject, it was competent for the legislature to prescribe what should be conclusive evidence that a law was constitutionally passed over the governor's veto, and that this was done by the first section of the second article of the act concerning laws (R. C. 1845). He referred to Story on the Constitution, § 839, 840, as to the purpose for which journals are kept. He also commented upon the cases cited from 23 Wend. 103 ; 2 Hill, 31 ; 4 Hill, 484 ; 1 Denio, 14 ; and Gifford v. Livingston, 2 Denio ; and concluded that in none of them was it distinctly settled that an act can be impeached by the journals.)

III. If the journals are examined, they will show no departure from the provisions of the constitution affecting the validity of the act.

Mr. *Gantt* stated the points argued by him, as follows :

I. In determining the validity of the act, the court can not look behind the enrolled bill, which is a record of the most absolute kind.

II. The provision of the constitution supposed to have been disregarded, is one which prescribes a merely formal mode of proceeding and is directory only.

III. If the observance of the provision be nevertheless important, it will be seen by looking into the journal that it has been observed.

Mr. *Gardenhire* argued the following points :

I. The enrolled bill and the certificate endorsed thereon, signed by the speaker of the house and the president of the senate, is not conclusive evidence that the constitutional requisites have been observed. (State v. McBride, 4 Mo. 303 ; 1 Kent, p. 500, note ; 14 Ills. 300 ; 23 Wend. 103, 104, 163 ; 2 Hill, 31 ; 4 Hill, 384, 390 ; 2 Stephen's Comm. 403 ; Dwarris on Stat. 31 ; 1 Greenl. Ev. § 482 ; 1 Bouvier's Law Dic. 674 ; 7 Cow. 613.) The constitution provides a mode of authenticating a bill passed over the governor's objections, by requiring the yeas and nays to be entered upon the journals, with the governor's objections. This is the constitutional substitute for the governor's signature, and the journals are the first, the original records of it, and it is not in the power of the legislature to change the constitutional mode of authenticating a law.

II. It was necessary to enter the governor's objections upon the journals of both houses.

III. The bill under consideration was not passed in the manner prescribed by the constitution, and it is not a law of the land.

SCOTT, Judge, delivered the opinion of the court.

On the 10th day of December, 1855, an act entitled "An act to secure the completion of certain railroads in this state" was passed by the general assembly, the governor's objections to the contrary notwithstanding. This act was authenticated

pursuant to the constitution and laws, and was deposited by the governor in the office of the secretary of state. It is agreed between the parties to this proceeding, that, according to the provisions of this act, if it is binding as a law, the Pacific Railroad Company became entitled, upon the performance of certain conditions therein mentioned, to have and demand from the governor of the state of Missouri, eight hundred state bonds, each for the sum of one thousand dollars, payable thirty years after date. It is also admitted that the said company has performed the conditions prescribed by the law, and did, on the 17th day of January, 1856, demand of the governor the said state bonds, and that the governor refused to issue them, alleging as a reason for such refusal, that the proceedings of the general assembly, after the return of said bill by him with his objections thereto, were not in conformity to the constitution, and especially to the requirements of the 10th section of the 4th article of that instrument.

Extracting from the agreed case the substance of so much of the journals as shows wherein consisted the alleged irregularity in reconsidering the bill, after its return with the governor's objections, it appears that the bill was sent to the governor on the 4th day of December, 1855, for his approval ; on the 10th day of that month, it was returned to the senate (the house in which it originated) by the governor with his objections, which were spread upon the journal of that day, and ordered to be printed. The bill was reconsidered on the same day and passed by the majority required by the constitution, its passage being evidenced by the names of those voting for and against it being spread upon the journal. After having passed the senate, the bill, together with the governor's message, was, on motion, ordered to be sent to the house of representatives. On the same day that the bill passed the senate, the fact of its passage by that body was communicated to the house of representatives, and it was immediately taken up for consideration, and after an unsuccessful motion to defer its reconsideration until the following day, and after dispensing with the read-

ing of the governor's objections, it passed by the requisite majority—the ayes and nays for and against the bill being spread upon the journal. On the 12th of December, on motion, the governor's objections to the bill were spread upon the journal of the house of representatives ; and on the 13th day of December, the senate journal was, on motion, so amended as to make it appear that on the day on which the bill passed the senate, it was ordered that the bill and message of the governor be sent to the house of representatives. It was further agreed that the admissions made on the part of the governor were made because the duties required by said bill are not political duties appertaining to his office of chief magistrate, but duties created by said bill, which he was willing to perform, if said bill be a law ; in which event there shall be no necessity for the actual emanation of the writ of mandamus, the governor being only desirous to know whether the said law be constitutional or not. The foregoing are substantially the facts on which the mandamus is prayed, requiring the governor to issue the bonds demanded by the Pacific Railroad Company.

This application involves several novel and very important questions. But it has been intimated that the matter first to be determined is whether a mandamus can issue to the chief executive officer of the state, requiring him to do any act ; and that in the event the opinion should be entertained that a mandamus can not issue to the governor, then the judgment of this court, on the other questions involved in the case, would be extrajudicial, and should not be expressed.

We know no rule or principle of law which prescribes the order in which the matters of law involved in a controversy of which a court has jurisdiction, shall be considered. If a question is fairly involved in a controversy, and it is so presented by the parties to it that its determination would settle the litigation, it would be unusual for the court to evade the question presented, and rid itself of the controversy by an opinion that would leave the legislation between the parties undetermined, to be again renewed. This is a matter of prudence and discretion,

in the exercise of which courts will be governed by circumstan-
ces.   By the constitution of this state the supreme court has
power to issue writs of mandamus, and to hear and determine
the same.   To the delegation of this power there is no excep-
tion.   The jurisdiction conferred extends to all writs of man-
damus, without any limitation whatever, and without any regard
to the official rank or condition of the party.   The jurisdiction
granted, it is supposed, is to be exercised as jurisdiction is ex-
ercised in all other cases.   When a court has a general juris-
diction over a subject, and a case arises for the exercise of that
jurisdiction, the most appropriate course is to issue the writ to
bring the party before it, and then to hear and determine the
question whether the case made is a proper one for the remedy
sought.   That the exception is to the jurisdiction of the person
makes no difference.   That exception, when the court has
jurisdiction of the subject matter of the suit, is to be taken and
determined like all others, after the return of the writ.   It is
erroneous to say that the court has no jurisdiction to issue a
mandamus to the governor.   The court has power to issue the
writ, and after a return to it, will determine whether that offi-
cer is subject to it or not.   If the conclusion is attained that
the case is not a proper one for a mandamus, that is not a de-
nial of the jurisdiction to hear and determine the cause, but a
determination of the controversy in favor of the party claiming
an exemption from the operation of the writ.   Applications for a
writ of mandamus may be based on such grounds as would, at
the first blush, satisfy a court that it could not be sustained.
Under such circumstances, it might, for the sake of expedition,
be refused on the ground stated by the petitioner.   This would
be no denial of the jurisdiction of the court.   As the court can
issue the writ in cases of any doubt or importance, an order is
made, as a matter of course, on the party to whom the writ is
prayed, requiring him to show cause why he should not be re-
quired to do the act whose performance is sought to be coerced
by the petitioner, and, on his return made to this order, all the
questions involved in the case are determined.   In the case of

Low v. Governor Towns, (8 Georgia, 365,) a mandamus was applied for to the governor. An order was made and served, requiring him to show cause why a peremptory writ should not go ; the governor appeared in obedience to the rule, and, upon his showing cause, the court held that for political reasons the chief magistrate of the state could not, by mandamus, be compelled to perform even a mere ministerial act; yet an opinion was expressed in relation to the matter in controversy between the parties. In the case of Taylor v. The Governor, (1 Ark. 21,) on an application for a writ of mandamus to the governor, the court, without determining the question whether a mandamus can be awarded to the chief magistrate of a state, gave an opinion on the merits of the controversy, and refused the writ. In the case of Marbury v. Madison, (1 Cranch, 50,) the supreme court of the United States granted a rule on the secretary of state, to show cause why a mandamus should not issue directing him to deliver a commission. The court heard the cause, expressed the opinion that the petitioner was entitled to his commission, and afterwards refused to issue a peremptory mandamus on the ground that the law conferring jurisdiction on the supreme court to issue writs of mandamus to public officers, was not warranted by the constitution. This was done by Chief Justice Marshall. If, by the law of the land, a writ of mandamus can not issue to the chief magistrate of the state, we do not maintain that he can waive this exemption. The rule, *qui libet potest renunciare juri pro se introducto*, is not applicable to the case. The question, whether a governor of a state can, by a mandamus, be compelled to perform a mere ministerial act imposed on him by law, has been discussed in the courts of some of the states of the Union, and has undergone some contrariety of determination. In the case of Bonner v. Pitts, (7 Georgia, 473,) it was the opinion of the court that a writ of mandamus might be issued to the governor of a state, requiring him to do a ministerial act. In the case of Taylor v. The Governor, (1 Ark. 21,) the question was left undetermined. In the argument of the case of Stokes v. Ken-

dall, (12 Pet. 524,) the attorney general of the United States, though appearing on behalf of the officer to whom the writ of mandamus was prayed, conceded that such a writ might be issued against the President of the United States to compel him to perform a duty merely ministerial—an admission entitled to some weight, when we take into consideration the officer by whom and the circumstances under which it was made. On the other hand, in the case of Low v. Governor Towns, (8 Georgia, 361,) we have seen that it was held that a writ of mandamus could not be issued to the chief magistrate of a state. The like doctrine was maintained in the case of Hankins v. the Governor, (1 Ark. 570,) and the court, in that case, refused to express any opinion on the matter in controversy, departing from the course that was pursued by the same court, in the case of Taylor v. the Governor, to which reference has already been made. (Story on the Constitution, vol. 2, § 1569.)

In the discussion of the question whether the chief magistrate of a state is subject to the writ of mandamus, the distinction between acts purely ministerial, about which he has no discretion, but is required by law to do them, and those in the performance of which his discretion or judgment is to be exercised, is constantly taken. The performance of one class of these duties, it is maintained, may be enforced by a mandamus, whilst the other, it is conceded on all hands, is of such a character that its performance can not be compelled by the courts. In order, then, to a full investigation of the question whether the writ can issue to the governor, it is necessary to look into the law to ascertain the nature of the duties enjoined, preliminary to which the question would naturally arise whether the law was constitutional. It may be urged that the question may be considered whether the writ of mandamus will, in any case, be issued to the governor, and if it should be determined that it can not be done, then there is an end of this controversy, so far as this court is concerned. In addition to the considerations heretofore addressed to this view of the subject, it may be

remarked that this is a real controversy between the parties to this proceeding. A large portion of the people feel a deep interest in the execution of a law, which they believe is not only essential to prevent a great sacrifice of capital already invested, but is ultimately connected with the improvement and permanent welfare of the state. A question arises whether that law is constitutional or not. An officer entrusted with the execution of that law entertains doubts whether it has passed in conformity to the requirements of the constitution, and seeks to have those doubts removed by the tribunal appointed, in the last resort, to ascertain and determine the meaning of the constitution and laws. In the proceeding instituted for that purpose, the constitutionality of the law is clearly involved, and it may be a question necessary to be determined in order to the settlement of this controversy. There are other questions involved, the determination of which, in a particular way, while it would end this suit, would not determine the matter in dispute. Under such circumstances, how much soever we may sympathize with those who were opposed to the passage of the law, we do feel that we would not have discharged the duty imposed on us, were we to select one of the questions involved, which, if determined in a particular way, would relieve us from the responsibility of settling the point in controversy. If, by such a course, this act should fail of being executed, no step has fallen under our observation so well calculated to inspire distrust in our institutions and laws. This court ordinarily, without hesitation, decides questions which are not necessary to be determined in order to dispose of a suit, but which are required to be settled in order to adjust finally the matter in litigation between the parties.

The question involved in this case, about which our opinion alone is sought, is presented in such a way by the argument of parties, as to render it unnecessary to decide whether a mandamus can issue to the chief executive, requiring him to do any act. Nor do we determine it, or preclude him from insisting on his exemption from it. We will express an opinion in rela-

tion to the point submitted for our judgment, and will so shape our course that the governor will, so far as our action is concerned, be entirely at liberty to raise the question of his liability to be coerced by a writ of mandamus, and have it judicially determined—a question about which we express no opinion, especially as it has not been argued on the part of the executive. After offering the foregoing considerations in vindication of the course which a sense of duty requires us to pursue on this occasion, we will proceed to consider the question which this application submits for our judgment.

Whilst the power of the courts to declare a law unconstitutional is admitted on all hands as being necessary to preserve the constitution from violation, yet such a power is claimed and exercised in relation to laws which on their face show that the constitutional limits have been transcended. The reason of this principle limits the claim of jurisdiction to such cases. The constitution is designed to limit the powers of the government, and to confine each of the departments to its appropriate sphere. If the legislature exceed its powers in the enactment of a law, the courts being sworn to support the constitution, must judge that law by the standard of the constitution, and declare its validity. But the question, whether a law on its face violates the constitution, is very different from that growing out of the non-compliance with the forms required to be observed in its enactment. In the one case, a power is exercised, not delegated, or which is prohibited, and the question of the validity of the law is determined from the language of it. In the other, the law is not, in its terms, contrary to the constitution ; on its face it is regular, but resort is had to something behind the law itself in order to ascertain whether the general assembly, in making the law, was governed by the rules prescribed for its action by the constitution. This would seem like an inquisition into the conduct of the members of the general assembly, and it must be seen at once that it is a very delicate power, the frequent exercise of which must lead to endless confusion in the administration of the law. This inquiry may be

extended to good as well as to bad laws—to those passed as well with the approval of the governor, as to those which are passed his objections to the contrary notwithstanding ; for it is clear that, if a law passed over the objections of the governor may be impeached by inquiring whether the forms of the constitution were observed in its enactment, the same inquiry may be instituted in relation to laws passed with his sanction ; and thus statutes, constitutional on their face, regular in their terms, which may have been the rules of action for years, and under which large amounts of property have been vested, and numerous titles taken, may be abrogated and declared void.  A principle with such a consequence should be supported by a weight of authority which no court can resist.   When we reflect on the manner in which the journals are made up, and the rank of the officers to which that duty is entrusted, how startling must the proposition be that all our statute laws depend for their validity on the journals of the two houses of the general assembly showing that all the forms required by the constitution to be observed in their enactment have been complied with.   The required forms may be observed, and the clerks may fail to make the necessary or correct entry.   If the journals had been designed as the evidence in the last resort that the laws were constitutionally passed, would not some method have been adopted by which greater care would have been exacted in entering the proceedings of the two houses ? Would the task of making them have been entrusted to a single clerk, with a power in the houses to dispense with their reading, even should there be a rule requiring them to be read—a matter, however, about which the constitution and laws are silent ? In that country from which we borrow so many of our ideas respecting government and laws, and whose common law and early statutes constitute the substratum of all our systems of jurisprudence, the statute roll is the only and the exclusive evidence of what the statute law is, so long as it is in existence.   Then it is maintained that, if the journal were every way full and perfect, yet it hath no power to satisfy, destroy

or weaken the act, which, being a high record, must be tried only by itself—*teste meipso.* "Journals are no records, but remembrances for forms of proceedings to the record; they are not of necessity, nor have they always been. They are like the dockets of the prothonotaries, or the particulars to the king's patent. The journal is of good use for the observation of the generality and materiality of proceedings and deliberations, as to the three readings of any bill, the intercourses between the two houses, and the like; but when the act is passed the journal is expired." (Hobart, 110.) "The judges ought to take notice of a general law, for they are to determine whether it be a statute or not, and therefore a man can not plead *nul tiel* record to it. It shall not be proved by a journal." (Hale's History, 13.) Numerous authorities might be cited of the same purport.

So it appears that by the common law the statute roll was the absolute and conclusive proof of a statute. This record could not be contradicted. It implied absolute verity. There was no plea by which the existence of a statute could be put in issue. Under this state of the law our constitution was adopted. That instrument provides that every bill, having passed both houses, shall be signed by the speaker of the house of representatives and by the president of the senate. This is the mode adopted for the authentication of every bill, and furnishes the evidence of its passage by the two houses in the first instance. The governor's signature to a bill is not required as a means or part of its authentication, but as evidence of his approval. The governor being no member of either house, and in contemplation of the constitution not being present during their deliberations, could not know whether a bill had passed the two houses or not. The constitution itself contemplated that there might be laws without the signature of the governor, and therefore the mode of authentication adopted was the evidence of the passage of all bills, in the first instance, by the two houses, as well those passed with his approbation as those passed against his consent. Now, looking at the matter by the light of rea-

son alone, is not the evidence furnished by the roll that the bill has passed the two houses, stronger and more conclusive to the mind than that furnished by the journal? The constitution does not expressly require a journal to be kept, though it evidently contemplates that there would be one. But it nowhere provides how the journal shall be authenticated. It does not require that it shall be signed by any one, not even a clerk. It is not required to be read or examined. Now, is not the evidence furnished by the bill, authenticated in the manner prescribed by the constitution, with the signatures of the highest officers of the two houses, more conclusive to the mind than the unauthenticated journals kept by the two houses? But on what principle is a resort had to the journals to impeach the validity of a law? It could not be done at common law; there is nothing in the constitution which authorizes any such resort even by implication. There is no statute law which sanctions such a course. Where, then, is the authority found for going behind the statute roll, and looking into the journals of the two houses, in order to ascertain whether they have conformed their conduct to the constitution in the enactment of the laws? Greenleaf is cited (§ 491) to show that the journals of either house are the proper evidence of the action of that house upon all matters before it. This is unquestioned law. But it is clear that the author did not mean that the journals, which are not records, are evidence to contradict the most solemn records known to the constitution and laws. In support of the position, reference is made to English authorities. Now those authorities, while they admit the journals are evidence, could never intend that they were evidence to contradict the statute roll; for if any one thing is better settled in the English law than all others, it is that the statute roll is a record of so high a nature that it imports absolute verity, and can not be contradicted. The case of Root v. King, (7 Cowen, 613,) is also cited by Greenleaf to show that the journals of the houses of assembly are evidence; but a reference to that case shows that the point, whether they are evidence to contradict the statute roll, was never

24—VOL. XXIII.

thought of or considered. Documents may be evidence for one purpose, but not for another. The oath of a competent witness is evidence; but because it is evidence, is it therefore to be received to contradict a solemn record? But it is said that courts have the undoubted right to declare the laws unconstitutional. No principle is better settled than this. But it has no application to the question under consideration; it has been applied to those cases in which it appears from the face of the law itself—cases in which it was conceded that the forms of the constitution were observed in its enactment. It has not been perverted to the purpose of going behind the statute roll in order to ascertain whether the legislature did not depart from the rules prescribed by the constitution for the government of its conduct in making the laws. In our investigation we have not met with a single case in which the courts have looked behind the statute roll in order to determine whether, in passing a law, the members of the legislature conformed their conduct to the rules directed by the constitution to be observed in framing laws. The case of Spangler v. Jacoby, (14 Illinois, 299,) does not detract from the correctness of this assertion. Nor do the cases of Douglass v. Bank of Missouri, (1 Mo. 23,) and the State v. McBride (4 Mo. 303). The question, how far it is permitted to go behind a statute roll in order to ascertain whether a law has been passed in conformity to the requirements of the constitution, has been considered in the courts of the state of New York. But the history of the controversy will show that the power assumed in this case was never claimed by one for the courts. By the constitution of the state of New York it is prescribed, " that the assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill appropriating the public moneys or property for local or private purposes, or creating, continuing, altering or renewing any body politic or corporate." It was provided by a law that no bill shall be deemed to have been passed by the assent of two-thirds of the members elected to each house, unless so certified by the presiding officer of each

house. A statute made it the duty of the secretary of state to certify and endorse upon every bill the day, month, and year when the same became a law, and made such certificate conclusive evidence of the facts therein declared. Under this provision of the constitution and these statutes, the general banking law and others, altering the charters of bodies politic, were passed ; they passed, however, as ordinary laws, and were not endorsed by the presiding officers of the two houses as having passed by a two-thirds vote. Questions arose whether these laws were not within the meaning of the constitution, and therefore should have been passed by a vote of two-thirds of the members of each house. It was held that these laws were not within the provision of the constitution requiring a two-thirds vote for their passage, and so a decision of the question, as to their constitutionality, became unnecessary. The extreme claim of those who maintained that the constitutionality of these laws might be inquired into by going behind the certificate of the secretary of state, was limited to the examination, whether the requisite number of votes had been given to pass them. The constitution requiring that the vote of two-thirds of the members should be necessary to pass such laws, it was maintained that the number of votes by which they had passed was of their essence and vitality, and therefore could be inquired into. Those who maintained this opinion deprecated any further inquiry into the manner in which the general assembly had conducted itself in the enactment of laws, maintaining that the certificate of the secretary of state was conclusive as to all other matters. This is as far as any case which has been shown us has gone. It is the principle of the case of Spangler v. Jacoby, (14 Illinois, 299,) to which reference has been made. It is the principle of the case of the State v. McBride (4 Mo. 23). The case in Illinois seems to be founded on the peculiarity of the constitution of that state. The case of McBride was not a case in which the authenticity of a statute roll was involved, but grew out of the provision in our constitution respecting the mode of making

amendments to it, and is deemed inapplicable to the question under consideration, as neither the constitution itself nor any statute prescribed a mode by which they should be authenticated, or declared what should be the evidence of their passage.

If the principle contended for in this case, and which, to the extent claimed for it, we have found maintained in no other, is sanctioned, then every law may be overturned which is shown by the journals to have been irregularly passed. It is asked, is the constitution to be departed from with impunity, and is there no way to confine the legislature to the observance of the rules of conduct prescribed by the constitution for its government in the enactment of laws? Our government is administered by means of trusts reposed in agents. Powers are confided to all the departments to be exercised in a mode prescribed by the organic law. The course required to be observed in the performance of an act is not always of its essence or vitality. When an act is directed to be done in a particular way, the direction may be merely mandatory—that is, it is not of the essence of the act, but the act may stand in law notwithstanding the direction was not strictly observed. This is a familiar principle. Those exercising the powers of the several departments are sworn to support the constitution; yet if they violate their duty, the exigencies of government require that their acts must be upheld. This is not true of all violations of the constitution, but is particularly applicable to violations of the class of those which are urged against the validity of the law under consideration. We do not mean to say that the general assembly violated its duty in the mode adopted in the reconsideration of the bill which is now before us. All we design to hold is, that there are forms to be observed in the enactment of laws; that the members of the legislature are sworn to observe those forms; and yet, if they are violated, the constitution never intended that their acts should be void. The provisions of the constitution alleged to have been violated in the reconsideration of this bill were designed to be directory. The objections urged against the manner of its reconsideration

Pacific Railroad v. The Governor.

are of such a character that it is impossible to say that if they did not exist the result would have been the same. If the form of spreading the message upon the journal, and reading it in both houses, had been complied with before the bill had been reconsidered, and all the members of both houses had stopped their ears and absolutely refused to hear or be informed of the nature of the governor's objections, would not the law still have been binding? Would not the spirit of the constitution have been violated by such a course, and yet the law be adjudged constitutional? The same arguments, which show that there must be an inquiry into the regularity of legislative proceedings, are as strong to show that there should be an inquiry into the acts of the other departments. Would it be allowed to inquire whether a judgment pronounced by this court, regular on its face, was not concurred in by the requisite number of judges? If the minutes of the court showed that a judgment was different from that entered of record, could the minutes be produced in evidence to invalidate the judgment? The constitution, in requiring the governor to approve a bill, contemplated that the act of approval should be done understandingly; that he should be informed of its contents. Now, in order to defeat a law, could it be shown that the governor approved it without knowing any thing whatever in relation to it? The sense of the words in which the forms to be observed in legislation are prescribed, may be matter of doubt. Different opinions may be entertained as to the meaning of the language in which they are expressed, as well as to the end or object of them. This very case furnishes an illustration of the truth of this remark. The members of the general assembly may conscientiously believe that they have pursued the constitutional course. But to give the executive and judicial departments a right to re-revise this exercise of their judgment, would it not be subjecting the legislature to a surveillance, which, instead of making it a coördinate department, would subject it to a dependence on the others. There is a fitness in making each department the sole judge of the rules prescribed for its conduct; this is necessary to render them coördinate, and not dependent on each other.

It remains to consider an argument drawn from the omission in the constitntion to provide a mode of authentication for those laws returned by the governor without his signature, and, after reconsideration, passed by both houses. From this omission the argument was advanced that the constitution, failing to pro-vide a mode of authentication for such laws, the journals of the two houses were the only evidence of the passage of thcm, and from those journals it must appear that the action of the two houses was in conformity to the forms prescribed by the consti-tution. The constitution having omitted to provide how those laws should be authenticated, it was competent for the legisla-ture to do so. Hence we find·that as early as the year 1820 a statute now in force, in relation to this subject, was passed.

We do not maintain that the legislature can prevent a scru-tiny into its acts, which the constitution designed should be made, by any mode of authentication it may adopt. We have endea-vored to show that the constitution never contemplated that ob-jections of the character urged against the law, whose validity is now under consideration, should be raised against a bill pass-ed with the approval of the governor. There is no reason why objections of a like character should be raised against a bill passed against his will. As the constitution did not contem-plate that such objections should be fatal to the validity of a law, the mode of authenticating bills passed over the objections of the governor, provided by the act of·1820, and which con-tinues in force to this day, is consistent with the constitution and is binding and conclusive. As the signatures of the pre-siding officers of the two houses were the evidence of the pas-sage of a bill in the first instance, nothing was more appropri-ate than that thc certificates of the same officers should be evi-dence of its passage against the consent of the governor. As their certificate shut out objections against the manner of pass-ing bills in the first instance, it is entirely consistent with the constitution and with reason that a like certificate should silence all objections of a like character taken against the mode of pass-ing it on its reconsideration.

Upon the whole, we are of the opinion that the objections

taken against the mode of passing this law by the general assembly on its reconsideration, are untenable; that the constitution and law precludes an inquiry as to the existence of such objections, the constitution regarding the provisions, alleged to have been violated in the passage of this law, as merely directory, and being so, a departure from them, even if there was a departure, would not render the law void.   Under the circumstances, we will not direct a peremptory writ, but a rule *nisi* will be made.   (Leonard, J., dissents.)