STATE OF IOWA, ex rel JOHN B. HAMMOND, Appellant, v. MRS.
MAURICE LYNCH, Appellee.

CONSTITUTIONAL LAW:   Statutes—Bills—Passage—Evidence—
1  Failure of Speaker to Sign Enrolled Bill. The final, conclusive,
   ultimate and only evidence of the passage of a "bill" by both
   houses of the legislature is the enrolled bill signed by both the
   president of the Senate and the speaker of the House. Sec. 15
   of Art. 3 of the Constitution, providing that "every bill having
   passed both houses shall be signed by the speaker and president
   of their respective houses," is necessarily mandatory.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN,
Judge.

WEDNESDAY, FEBRUARY 17, 1915.

A demurrer to a petition praying that a nuisance be en-
joined was sustained and, as plaintiff failed to plead over,
the petition was dismissed. The State appeals.—*Affirmed.*

*George Cosson,* Attorney General, *C. A. Robbins,* Assist-
ant Attorney General for the State, *Schenk & Lehmann,* for
appellant.

*Parsons & Mills* and *Dunshee & Haines,* for appellee.

LADD, J.—The petition alleged that Mrs. Maurice Lynch was maintaining the premises described, leased by her of her co-defendant, as a place of lewdness, assignation and prostitution in violation of law and prayed that

1. CONSTITU-
TIONAL LAW:
statutes:
bills: passage:
evidence: fail-
ure of speaker
to sign en-
rolled bill.

she be restrained from so doing. The defendant demurred to the petition on several grounds, only one of which is argued, and that is that Chapter 214 of the Acts of the Thirty-third General Assembly, as the same appears among the enrolled bills in the office of the secretary of state, though duly signed by the president of the senate and approved by the governor, was never signed by the speaker of the house of representatives. An inspection of the bill as it appears in the office of the secretary of state verifies the allegation and, of course, the demurrer admits it. If the signature of the speaker of the house of representatives as well as that of the president of the senate was essential to the authentication of the bill as having passed the general assembly, Chapter 214 as printed in the session laws of 1909, under which this suit was begun, cannot be deemed to have been enacted by that body and did not become the law of this state.

The provisions of the constitution bearing thereon are found in Article 3. Sec. 9 thereof declares that: ''Each house shall . . . keep a journal of its proceedings, and publish the same.'' Sec. 10: ''The yeas and nays of the members of either house, on any question, shall, at the desire of any two members present, be entered on the journals.'' Sec. 15: ''Every bill having passed both houses, shall be signed by the speaker and president of their respective houses.''

Sec. 16. ''Every bill which shall have passed the general assembly shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it; but if not, he shall return it, with his objections, to the house in which it originated, which shall enter the same upon their journal, and proceed- to reconsider it; if, after such reconsideration, it again pass both houses, by yeas and nays, by a majority of

two-thirds of the members of each house, it shall become a law, not withstanding the governor's objections. If any bill shall not be returned within three days after it shall have been presented to him (Sunday excepted) the same shall be a law in like manner as if he had signed it, unless the general assembly, by adjournment, prevent such return. Any bill submitted to the governor for his approval during the last three days of a session of the general assembly, shall be deposited by him in the office of the secretary of state within thirty days after the adjournment, with his approval, if approved by him, and with his objections, if he disapproves thereof.''

Sec. 17. "No bill shall be passed unless by the assent of a majority of all the members elected to each branch of the general assembly, and the question upon the final passage shall be taken immediately upon its last reading, and the yeas and nays entered on the journal.''

The authorities agree that the bill, when signed, as exacted by the speaker of the house and president of the senate and approved by the governor and deposited with the secretary of state, is at least prima-facie evidence that it was passed by the legislature; but many courts entertain the view that it is within their jurisdiction to ascertain whether the authentication as thus made is correct, and whether the legislature in fact did what its presiding officers say it did, and what the governor approved, and for that purpose to resort to the journals of the respective houses and even consider other evidence bearing on the question. See *State v. Swan,* 7 Wyo. 166, 75 Am. St. 889 and cases therein cited; *Rode v. Phelps,* 45 N. W. (Mich.) 493; *State v. Frank,* 83 N. W. (Neb.) 74; *State v. Deal,* 4 So. (Fla.) 899; *Spangler v. Jacoby,* 14 Ill. 297, 58 Am. Dec. 571.

Other authorities are to the effect that while the constitution has prescribed the formalities to be observed in the passage of bills and the creation of statutes, the power to determine whether these formalities have been complied with

is necessarily vested in the legislature, and a bill having been authenticated and promulgated by the legislative department to the public in the manner authorized by the constitution, this is conclusive evidence of its proper passage by the legislature. As all decisions entertaining the latter view exact, as essential to the authentication of the enrolled bill and proof of its passage, the signatures of both the speaker of the house and president of the senate, inquiry as to whether we may look beyond the enrolled bill to ascertain whether it is in fact a statute of the state is pertinent. The expressions contained in the opinions of this court are in harmony with the authorities declaring the enrolled bill conclusive. In *Clare v. State*, 5 Iowa 508a, 509, the question was as to whether the enrolled bill in the office of the secretary of state or as published in the session laws was controlling and the court said: "The original act in the secretary's office is the ultimate proof of the law, whatever errors there may be in what purports to be copy thereof; and the court will inform itself and take cognizance of the true reading of the statute."

In *Duncombe v. Prindle*, 12 Iowa 1, the question involved was whether township 90 was taken from Webster county and added to Humboldt county, and it was contended that the number "90" was omitted by mistake from the act as published but appeared in the original bill. The court, upon examination of the enrolled bill, found this not to be so and added: "This enrolled bill, thus filed and preserved in the secretary's office, is the authenticated copy of the real bill which the General Assembly passed, and is the ultimate proof of the true expression of the legislative will, as this court has before held: *Clare v. The State of Iowa*, 5 Iowa 510. And that for the obvious reason that it is the bill which received the signatures of the officers of both branches of the legislature, after a committee appointed for that purpose had compared it with the law as passed, and reported it a correct copy of the same. Behind this it is impossible for any court to go for the purpose of ascertaining what the law is. There is no

other bill, original or a copy, to which the signatures of the President of the Senate and Speaker of the House of Representatives are affixed, or to which is appended the approval by the Governor. And when counsel speak of some other original bill than this, in which the township 90 was embraced, we confess we are at a loss to conceive what they mean. Are we to suppose that the enrolling clerk, and the committee appointed to examine and report upon the accuracy of his work, have all been guilty of laches or corruption, especially in the absence of any competent proof to that effect?''

Though not involved in *Koehler v. Hill,* 60 Iowa 543, the court in the course of its opinion, observed that: ''Inasmuch as a bill, before it becomes a law, must be signed by the presiding officers of the two houses and by the governor as will be assumed, we may, for the purpose of this case concede, if it has been enrolled and so signed, and deposited in the office of the secretary of state, it is the ultimate and conclusive evidence of the contents of the bill which passed the General Assembly and cannot be contradicted by the journals because there are no constitutional provisions requiring that it shall be entered on the journals.'' And further on, at page 563, it was said: ''For fear we may be misunderstood, we will repeat that, when a bill or joint resolution is required to be signed by the presiding officers and the governor and it is so signed, it will be conceded that such bill or resolution constitutes the ultimate and conclusive evidence of the contents thereof.''

In *Darling v. Boesch,* 67 Iowa 702, the bill was presented to the governor for his approval during the last three days of the session of the general assembly and he did not sign it, and merely deposited it in the office of the secretary of state without objection thereto within thirty days, and the court held that it did not become a law.

In *Miller v. City of Oelwein,* 155 Iowa 706, it was declared that, ''The enrolled bills duly signed and deposited with the secretary of state constitute the ultimate proof of

their regular enactment, and behind them it is impossible for any court to go for the purpose of ascertaining what the law is." *Duncombe v. Prindle, supra,* and *Collins v. Laucier,* 45 Iowa 702, were cited and also *Western U. Tel. Co. v. Taggart,* 141 Ind. 281; 60 L. R. A. 671. But later on, this was added: "Mere failure of the journal to show compliance with the requirements as to the method of enacting the law will not be conclusive that such requirements were not complied with," citing *Commissioners v. Higginbotham,* 17 Kan. 62.

In the recent case of *Conly v. Dilly,* 153 Iowa 677, the contention was that the two houses did not adopt the same bill in that in passing the house it included two amendments omitted by the senate; and among other things, the court observed that "In the first place, it is extremely doubtful if the courts can properly go behind the enrolled bill to scrutinize the details of its legislative history for grounds upon which to hold it invalid. *Clare v. State,* 5 Iowa 508a, 510; *Duncombe v. Prindle,* 12 Iowa 1; 36 Cyc. 971. It may be held that if the record affirmatively disclosed the adoption of an amendment which does not appear in the enrolled bill, or that such bill did not receive a constitutional majority of either house, or other vital defect of that nature, the court would not be bound to accept the enrollment and publication of an alleged statute as a finality; but we are here asked to go very much farther than the suggested case and to presume that the house did adopt certain amendments of which there is not the slightest record, except of the fact that the journal does not show what was done with these amendments, may afford good ground to criticize the manner of keeping the record; but we know of no rule of law or reason by which we can presume they were adopted by the house."

It will be noted that the point under consideration was not involved in any of these cases, but it was covered by what was said in *Duncombe v. Prindle, supra,* and that decision is generally cited in opinions holding that the enrolled bill in the office of the secretary of state when properly attested is con-

clusive evidence of its enactment; and even though what was said in other decisions be *dicta,* these indicate the trend of thought of those concurring therein. Moreover, upon an examination of the conflicting authorities we are inclined to the opinion that this construction has the better reason for its support. There is quite enough uncertainty as to what the law is without saying that no one may be certain that an act of the legislature has become such until the issue has been determined by some court whose decision might not be regarded as conclusive in an action between other parties. Regardless of the good faith of a person or officer relying on the enrolled bill in the office of the secretary of state, this would afford no protection from the consequence of his acts if it should turn out that the journals or other evidence disclosed fatal defects in its passage. One believing that he was complying with the law might be unwittingly committing a crime, or an officer paying out money in supposed obedience to a statute might discover too late that the enactment he undertook to obey had not been adopted in the manner prescribed by the Constitution, according to record of clerks, though the legislators were proceeding under solemn oath of obedience to the fundamental law. It seems quite enough that the average citizen must take notice of the contents of the enrolled bill, when duly authenticated, subsequent to July 4th after passage, without also putting upon him the burden of ascertaining the condition of the journal of the respective houses bearing thereon and determining for himself the effect of any irregularity therein tending to invalidate the bill. Courts could not rely upon the published session laws, but would be required to look beyond these to the journals of the house and senate and often to any printed bills or amendments which might be found after the adjournment of the general assembly. Otherwise, after relying on the prima-facie evidence of the enrolled bills, authenticated as exacted by the Constitution, for years, it might be ascertained from the journals that an act theretofore enforced had never become a law. The inconvenience

of such a rule and the consequent confusion is a strong argument against its adoption.

What is the design of exacting the signing of the enrolled bills by the presiding officers of the two houses and the approval of the governor, and that they be deposited with the secretary of state? Is it not that these are the final records of the acts of the legislature for the information and guidance of other departments of government? If so, why should they not be accorded the respect usually accorded solemn records? If merely steps in the enactment of laws, why are not other matters exacted in the passage of a bill also required to be preserved? The Constitution nowhere requires the bill to be made of record. Aside from entering the yeas and nays on the journal on final passage, no record except the enrolled bill duly authenticated is exacted by the fundamental law; and as the legislature is a co-ordinate branch of the government, in no sense inferior to the other branches and equally bound by oath of obedience to the Constitution, we perceive no reason for not regarding its final record as embodied in such enrolled bill, authenticated as required by Sec. 16 of Article 3 of the Constitution, as absolute a verity as the judgment of a court. Of course, a judgment may be attacked, but not collaterally; and that is the only way an enrolled bill may be assailed.

Each of the three departments of our government is equal and each should be responsible to the people whom it represents. The legislature enacts laws and is commanded by the Constitution to enact them in a certain way. The executive enforces the laws and by the Constitution it is made his duty to take certain steps looking toward such enforcement in the manner prescribed therein upon the happening of certain contingencies. The judicial department is charged with the duty of interpreting the laws, adjudging rights and obligations thereunder. Such being the respective duties of the several departments, it would seem that when certified to have been performed as required by the Constitution, this should

be conclusive on the other departments; and there would seem no more impropriety in the legislature's seeking to go behind the final record of a court to determine whether it had obeyed some provision of the Constitution in making such record than there would be in the court's seeking to go behind the final record made by the legislative department. Where the executive is charged with taking certain things upon contingencies happening and is given no power to act except upon such contingency, if he determines that the contingency exists and acts in pursuance thereof, the courts will not inquire into the fact as to whether he decided correctly in determining the existence of the contingency. Indeed, to preserve the harmony of our form of government, these mandatory provisions must be considered as addressed to the department which is called upon to perform them and neither of the other departments will be permitted in any manner to coerce that department into obedience thereto. Those courts which uphold the inquiry as to whether the legislature has observed the mandatory provisions of the Constitution necessarily assume that it were safer to entrust the enforcement of these to the judicial department than the legislature, and that the judicial department is the only one in which sufficient integrity exists ·to insure observance of the provisions of the Constitution. Such an attitude seems intolerable. It is sometimes said that the courts assume superiority over the legislature in determining that an act violates a provision of the Constitution. This is not so, however, for they merely undertake to· determine whether an act of the general assembly is in conflict with the Constitution and if it is, the statute necessarily must yield, for that the Constitution has a sanction greater than can be given by the action of any department of state.

"Upon principle then, in view of the division into departments under our form of government, each of equal authority, one department cannot rightfully go behind the final record certified to it or to the public from either of the

other departments. And the judicial department is no more justified in going behind the final act of the legislature to see if it has obeyed every mandatory provision of the Constitution than has the legislature to go back of the final record made by the courts to see whether or not they have complied with all the constitutional requirements." *State v. Jones,* 6 Wash. 452; 23 L. R. A. 340.

What was said in *Evans v. Browne,* 30 Ind. 514; 95 Am. D. 710, is especially pertinent: "It is argued that, if the authenticated roll is conclusive upon the courts, then less than a quorum of each house may, by the aid of corrupt presiding officers, impose laws upon the state in defiance of the inhibition of the Constitution. It must be admitted that the consequence stated would be possible. Public authority and political power must, of necessity, be confided to officers who, being human, may violate the trusts reposed in them. This, perhaps, cannot be avoided absolutely. But it applies also to all human agencies. It is not fit that the judiciary should claim for itself a purity beyond others; nor has it been able at all times with truth to say that its highest places have not been disgraced. The framers of our government have not constituted it with faculties to supervise co-ordinate departments, and correct or prevent abuses of their authority. It cannot authenticate a statute. That power does not belong to it. Nor can it keep the legislative journal. It ascertains the statute law by looking at its authentication, and then its function is merely to expound and administer it. It cannot, we think, look beyond that authentication, because of the Constitution itself. If it may, then for the same reason it may go beyond the journal when that is impeached; and so the validity of the legislation may be made to depend upon the memory of witnesses, and no man can in fact know the law, which he is bound to obey. Such consequences would be a large price to pay for immunity from the possible abuse of authority by the high officers who are, as we think, charged with the duty of certifying to the public the fact that a statute has been

enacted by both houses. Human governments must repose confidence in its officers. It may be abused, and there may be no remedy. Nor is there any great force in the argument, which seems to be regarded as of weight by some American courts, that some important provisions of the Constitution would be a dead letter if inquiry may not be made by the courts beyond the rolls. This argument overlooks the fact that legislators are sworn to support the Constitution or else it assumes that they will wilfully violate that oath. It is neither modest nor just for judges thus to impeach the integrity of another department of government, and to claim that the judiciary only will be faithful to its obligations.''

It is also to be observed that the manner of keeping the journal by either the house or senate is not prescribed in the Constitution. Nor does it require that the acts as finally passed shall be preserved in any form or place other than as enrolled bills, authenticated as exacted therein, deposited with the secretary of state. In *State v. Jones, supra,* the court in reverting to this matter said: ''The enrolled acts are prepared with some care, and, under the rules of our legislature and of every legislative body of which we have any knowledge, some committee is charged with the responsibility of seeing that such enrolled bills are compared with the one which actually passed the legislature before they are presented to the presiding officer for signature. There is therefore some protection thrown around these enrolled acts, and it would be a difficult matter for anyone through carelessness or fraud to prevent the will of the legislature, as expressed in the bill actually passed, being embodied in the enrollment thereof. But if the doctrine be once established that the fact that such bill had passed can be negatived by the journal, there would be very little to prevent a bill which had been properly passed, being defeated by the carelessness or fraud of the journal clerk or some employee under him. Under the practice prevailing in the legislature of this state, and in most of the other states, there is very little assurance that the journal will fully and

accurately show the proceedings of the body for which it is kept. The practice in nearly all such bodies is to have the journal read, if read at all, from loose slips of paper, made up partly in writing and partly by pasted slips, and, after being thus read, ordered approved. It is also a fact of which everyone has knowledge that often upon such reading there is such inattention on the part of the members of the legislature that gross errors might pass unnoticed. The journal, as thus read and approved, from loose slips of paper, is then passed to the journal clerk and by him, or under his direction, transcribed into a book, and the slips then carelessly preserved or entirely destroyed. The transcription of these minutes, without any further action on the part of the legislature, or of any person but the one who makes it, except superficial examination by the journal clerk, and possibly by the presiding officer, becomes the formal journal. It follows that the chances of mistake are very great, and for fraud upon the part of the copyist even greater. The Constitution requires that there should be a majority of the body recorded as voting in favor of a bill upon its final passage. Upon such passage, the bill in fact receives one or two more than such constitutional majority, and is duly passed; but if, by carelessness or fraud, the copyist should change one or two of the names of those voting, from the affirmative to the negative, the will of the legislature, regularly expressed, would be defeated; and the same result might follow if in copying he should omit a name. Not only would such results follow in the cases specified, but in many other ways the least error in making up or transcribing the journal might result in the defeat of the will of the legislature. Unless the method of keeping journals should at once be revolutionized, and so much attention be paid to them that they will be made to absolutely represent all the doings of the body to such an extent as to very much prolong the sessions of the legislature, the sanctity of legislative enactments will be entirely dependent upon the carefulness and good faith of some copyist em-

ployed by the legislature at a few dollars a day. Much less evil will grow out of a course of decision which will give the people to understand that the legislative is a department of the government, of as high authority as the judicial, and that with the mandatory provisions directed to it, the other departments of the government have no concern. When this is once well understood, the people will see to it that such mandatory provisions are complied with by the legislature, or, if they do not, the blame must rest upon themselves or the system of government which has as its basis the equal authority of the three departments into which it is divided.''

In *Pacific Ry. Co. v. Governor of Missouri*, 23 Mo. 353, 66 Am. Dec. 673, in considering this subject, the court, speaking through Scott, J., said: ''If the legislature exceed its powers in the enactment of a law, the courts, being sworn to support the Constitution must judge the law by the standard of the Constitution, and declare its validity. But the question whether a law on its face violates the Constitution is very different from that growing out of the non-compliance with the forms required to be observed in its enactment. In the one case, a power is exercised, not delegated, or which is prohibited, and the question of the validity of the law is determined from the language of it. In the other, the law is not, in its terms, contrary to the Constitution; on its face it is regular, but resort is had to something behind the law itself in order to ascertain whether the general assembly in making the law was governed by the rules prescribed for its action by the Constitution. This would seem like an inquisition into the conduct of the members of the general assembly, and it must be seen at once that it is a very delicate power, the frequent exercise of which must lead to endless confusion in the administration of the law. This inquiry may be extended to good as well as to bad laws,—to those passed as well with the approval of the governor as to those which are passed, his objections to the contrary not-

withstanding; for it is clear that if a law passed over the objections of the governor may be impeached by inquiring whether the forms of the Constitution were observed in its enactment, the same inquiry may be instituted in relation to laws passed with his sanction; and thus statutes, constitutional on their face, regular in their terms which may have been the rules of action for years, and under which large amounts of property have been vested, and numerous titles taken, may be abrogated and declared void. A principle with such a consequence should be supported by a weight of authority which no court can resist. When we reflect on the manner in which journals are made up, and the rank of the officers to which that duty is intrusted, how startling must the proposition be that our statute laws depend for their validity on the journals of the two houses of the general assembly, showing that all the forms required by the Constitution to be observed in their enactment have been complied with! The required forms may be observed, and the clerks may fail to make the necessary or correct entry. If the journals had been designed as the evidence in the last resort that the laws were constitutionally passed, would not some method have been adopted by which greater care would have been exacted in entering the proceedings of the two houses? Would the task of making them have been intrusted to a single clerk, with a power in the houses to dispense with their reading, even should there be a rule requiring them to be read, a matter, however, about which the Constitution and laws are silent? In that country from which we borrow so many of our ideas respecting government and laws, and whose common law and early statutes constitute the substratum of all our systems of jurisprudence, the statute roll is the only and the exclusive evidence of what the statute law is so long as it is in existence. There it is maintained that if the journal were every way full and perfect, yet it hath no power to satisfy, destroy, or weaken the act, which, being a high record, must be tried only by itself,—*teste me ipso.*

. . . So it appears that by the common law the statute roll was the absolute and conclusive proof of a statute. This record could not be contradicted. It implied absolute verity. There was no plea by which the existence of a statute could be put in issue. Under this state of the law our Constitution was adopted.''

In *Sherman v. Story*, 30 Cal. 253, 89 Am. Dec. 93, will be found a review of the authorities up to that time, the court concluding that, ''The result of authorities in England and in the other states clearly is, that at common law, whenever a general statute is misrecited or its existence denied, the question is to be tried and determined by the court as a question of law,—that is to say, the court is bound to take notice of it, and inform itself the best way it can; that there is no plea by which its existence can be put in issue and tried as a question of fact; that if the enrollment of the statute is in existence, the enrollment itself is the record, which is conclusive as to what the statute is, and cannot be impeached, destroyed, or weakened by the journals of Parliament, or any other less authentic or less satisfactory memorials; and that there has been no departure from the principles of common law in this respect in the United States, except in instances where a departure has been grounded on or taken in pursuance of some express constitutional or statutory provision requiring some relaxation of the rule, in order that full effect might be given to such provisions; and in such instances the rule has been relaxed by judges with great caution and hesitation, and the departure has never been extended beyond an inspection of the journals of both branches of the legislature. It remains to be seen whether there is anything in our Constitution or laws requiring or authorizing a departure from the common-law rule. . . . When we once depart from principle,— from a sound rule of law,—where shall we stop? Do not the circumstances of this case open to our vision a vista of absurdities into which we shall stumble if we attempt to explore for-

bidden fields for evidence of a vague, shadowy, and unsatisfactory character upon which to overthrow the enrolled statutes of the land? In this case, the enrollment, the record of the statute, exists and we are satisfied that we should not look beyond it, certainly not beyond the record, aided by the journals, and looking at both, we must hold the entire act to be a valid law."

This decision was followed in *County of Yolo v. Colgan,* 132 Cal. 265, 84 Am. St. Rep. 41, though its author, since a judge of the United States Circuit Court, afterwards seems to have raised some doubt as to its correctness in *County of San Mateo v. Ry.,* 13 Fed. 722.

The question was exhaustively considered in *Pangborn v. Young,* 32 N. J. L. 29, where, among other things, the court said: "For whoever engages in any transaction the validity or construction of which depends upon statutory provisions, whoever holds or acquires any sort of property, or right, the title or enjoyment of which may be affected by the operation of any law, is bound to take notice, at his peril, what the law is. And it is not enough for him to know what the law is after a court of last resort has made an investigation and determined what part of the statute roll is to stand and what part to fall, but he must know in advance of litigation, and govern his conduct accordingly. If there is any record or document outside of the statute roll to which a court will resort for the purpose of testing the validity of an enrolled law, he must not overlook it. If a court will hear oral testimony to impeach the record, he must be able to conjecture in advance what the testimony will be, and what weight will be allowed to it. Considering the exigency of this rule, it is easy to perceive of what extreme importance it is that there should be some high, authentic and unquestionable record to which not only courts and public officers, but private citizens may resort, and by a simple inspection determine for themselves with infallible certainty what are the statutes of the

state, and what are their terms. Considerations such as these had led to the firm establishment in England, at a date anterior to American independence, of the maxims that matters of public law are not the subject of allegation or denial in pleading, nor of proof upon the trial of causes; but that courts would always take judicial notice of the law, and that, upon the suggestion of any doubt as to the existence or provisions of a parliamentary enactment, the court would inform itself in the best way it could, not by listening to proofs, but by inspection of the record, if it was in existence, and if not by looking to the printed statute, or failing that, by examination of other documents where it had been recited, recognized and acted upon. The record which, as long as it existed, was held to import absolute verity, which not only dispensed with, but excluded all other evidence which could neither be aided nor impeached by the journals of parliament, was the copy of the act enrolled by the clerk of the parliament and delivered over into chancery. The question frequently arose in England, but the rule was uniformly maintained that the courts would look to the statute roll, and to that alone.''

The issue is also well considered in *State v. Swift,* 10 Nev. 176, 21 Am. R. 721; *Green v. Weller,* 32 Miss. 650; *Carr v. Coke,* 116 N. C. 223, 47 Am. St. 801; *People v. Devlin,* 33 N. Y. 269, 88 Am. D. 377, and many other cases. The authorities bearing on all phases of the inquiry will be found collected in the opinion and note to *Atchison, Topeka & Santa Fe Ry. Co. v. State,* 40 L. R. A. (N. S.) 1.

The Supreme Court of the United States held an enrolled act duly authenticated and on file with the secretary of state conclusive proof of the law as passed by Congress in *Field v. Clark,* 143 U. S. 649, 36 L. Ed. 294, where, speaking through Harlan, J., it said: ''The signing by the Speaker of the House of Representatives and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration of the two houses, through their

presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate and of the President of the United States, carries, on its face, a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance and to accept, as having passed Congress, all bills authenticated in the manner stated; leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution.

"It is admitted that an enrolled Act, thus authenticated, is sufficient evidence of itself—nothing to the contrary appearing upon its face—that it passed Congress. But the contention is, that it cannot be regarded as a law of the United States if the journal of either House fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses, and approved by the President. It is said that, under any other view, it becomes possible for the Speaker of the House of Representatives and the President of the Senate to impose upon the people as a law a bill that was never passed by Congress. But this possibility is too remote to be seriously considered in the present inquiry. It suggests a deliberate conspiracy to which the presiding officers, the committees on enrolled bills, and the clerks of the

two houses must necessarily be parties, all acting with a common purpose to defeat an expression of the popular will in the mode prescribed by the Constitution. Judicial action based upon such a suggestion is forbidden by the respect due to a coordinate branch of the government. The evils that may result from the recognition of the principle that an enrolled Act, in the custody of the Secretary of State, attested by the signatures of the presiding officers of the two houses of Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of Congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them.''

There the court held it not competent to show from the journals of the house and other evidence that the enrolled bill as passed contained a section not found in the enrolled act in the office of the secretary of state.

Enough has been said and quoted to clearly indicate the grounds of our conclusion that the enrolled bill on file with the secretary of state is the ultimate proof of its passage in the form there appearing and that beyond this, the courts cannot go in ascertaining whether the legislature complied with the requirements of the Constitution. The authorities seem about evenly divided as to whether resort may be had to the journals of the houses, but there is a decided tendency in recent decisions to hold that the enrolled bill is conclusive evidence of its passage as it appears. In the last edition of Sutherland on Statutory Construction at page 72 the author observes that ''It is no longer true that 'in a large majority of the states' the courts have held that the enrolled act may be impeached by a resort to the journals. A comparison will show that the courts are now about equally divided on the question. The current of judicial decision in the last ten years has been strongly against the right of the courts to go back of the enrolled act. Undoubtedly, the decision of the

Supreme Court of the United States in *Marshall Field & Co.
v. Clark,* 143 U. S. 649, 36 L. Ed. 294, 12 Sup. Ct. Rep. 495,
has had much to do in creating and augmenting this current,
but it may also be due to the greater simplicity, certainty,
and reasonableness of the doctrine which holds the enrolled
act to be conclusive. Many courts and judges, while feeling
compelled to follow former decisions holding that the enrolled
act may be impeached by the journals, have done so reluc-
tantly, and have expressed doubts as to the validity of the doc-
trine, and in many cases, as will appear in the following sec-
tions, have qualified and restricted it in important particu-
lars.''

Dissatisfaction with the contrary rule has been expressed
in the following cases: *Webster v. Little Rock,* 44 Ark. 536;
*People v. Starne,* 35 Ill. 121, 85 Am. D. 348; *State v. An-
drews,* 64 Kans. 474, 67 Pac. 870; *State v. Moore,* 37 Neb.
13, 55 N. W. 299.

In *State v. Chester,* 39 S. C. 307, 17 S. E. 752, previous
decisions were overruled. The entire field on both sides has
been covered in the decisions of other states and we have
sought only to indicate the reasons which have been persua-
sive to us in reaching the conclusion that the enrolled bill
duly authenticated as exacted by the provisions of the con-
stitution is conclusive, not only that it passed the general as-
sembly but that it so did in the form of the enrolled bill. In
other words, the several sections of the Constitution are man-
datory and when an act has been promulgated as therein pre-
scribed, only then does it become a law of the state. This
does not relieve either house of the obligation under Sec. 17
of Article 3 of the Constitution of seeing to it that the yeas
and nays on the final passage of every bill are entered on its
journal. This is to be actually complied with and only when
so done and it appears that a ''majority of all members elected
to each branch of the general assembly'' have assented there-
to is the bill to be ''signed by the speaker and president of
their respective houses.'' Sec. 15 of Article 3. Thereby the

presiding officer of each house certifies to the passage of the
bill in conformity with the requirement of the Constitution
and the rules of the respective houses and such certification
may not be impeached by the very fallible record of some clerk
ordinarily made up from hastily prepared memoranda and
for the preservation of which the law makes no provision, or
other evidence of like character. The respective houses hav-
ing certified to the passage of a particular bill in the manner
prescribed by the fundamental law, it is not competent for
the courts to inquire whether the general assembly—a co-or-
dinate branch of government—has observed the requirements
of the Constitution devolving upon it and inquire whether
its certification is true. Such a course would be inconsistent
with the independent character of the legislative department,
which necessarily must pass on the manner of performing its
duties; though, as previously observed, the extent of its pow-
ers as defined by the Constitution is appropriate matter for
judicial inquiry. A bill may be presented to the governor for
approval only after it has passed both houses, and the only
authentication of the bill in form or substance as being that
which has been passed is the signature of each presiding offi-
cer, and only when so signed and approved or approval omitted
for three days is it deemed a verity, and the courts will not
get behind the enrolled bill to ascertain whether the legisla-
ture complied with the requirements of the Constitution in its
adoption. In other words, the certification through the pre-
siding officers by the General Assembly is deemed conclusive
evidence that the bill was passed as exacted by the Constitu-
tion. What has been said, perhaps, indicates with sufficient
definiteness our conclusion that the signature of the speaker
was essential to the validity of the enrolled bill. Courts hold-
ing that resort may not be had to other than the enrolled bills
to ascertain their enactment by the General Assembly are
unanimous in deciding that the signature of the pre-
siding officer of each house is essential as proof of their
passage and that the omission of either is fatal to the bill.

26 Am. & Eng. Enc. of Law (2nd Ed.) 545. Moreover, the greater number of those deciding that the journals of the respective houses or other evidence may be resorted to for the purpose of ascertaining whether constitutional requirements have been observed as to the manner of passing a bill, entertain the same view and declare the omission of the signature of either presiding officer from the enrolled bill fatal. *State v. Platt,* 2 S. C. 150, 16 Am. R. 647; *Moody v. State,* 48 Ala. 115, 17 Am. R. 28; See 26 Am. & Eng. Enc. of Law (2nd Ed.) 545; *Lynch v. Hutchinson,* 219 Ill. 193; 4 A. & E. Ann. Cases 904; *State v. Howell,* 26 Nev. 93; *Scarborough v. Robinson,* 81 N. C. 409; *Jones v. Hutchinson,* 43 Ala. 721; *Legg v. Annapolis,* 42 Md. 203; *State v. Kiesewetter,* 45 Ohio St. 254, 263, 12 N. E. 807. Manifestly, this is because of the very tenable theory that all provisions of the Constitution, unless the contrary appears therefrom, are to be regarded as mandatory. It is hard to understand arguments construing any portion of the fundamental law as discretionary; for, if so, there could be no adequate reason for including it therein. As observed by Judge Cooley in his work on Constitutional Limitations, p. 94: "The courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a Constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the things to be done; and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules, by which all departments of the government must at all times shape their conduct; and, if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. We are not, therefore, to expect to find in a Constitution provisions which the

people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or mode of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument when we infer that such directions are given to any other end; especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leaving as little as possible to implication.''

This is expressive of the view entertained by the great weight of authority and there appears no sound reason for not holding, in accordance therewith, that, in order that a bill may become a valid law of this state, compliance with the section of the Constitution under consideration (Sec. 15 of Article 3), exacting the signature of the speaker of the house as well as that of the president of the senate, is essential to the authentication of the bill in form and substance as well as essential to certifying its passage. All are presumed to know the law and it is of highest importance to each citizen as well as to the public officer that there be an authentic record to which he may resort to ascertain certainly and definitely what laws are enacted by the legislature which control him and which he is bound to observe at his peril. Whatever conduces to certainty in this respect is of great moment to every person in the state and no rule of construction would be wise which would leave so important a matter to doubt or uncertainty. Our conclusion that the enrolled bill must be

signed by both the speaker of the house and the president of the senate, and that when so signed and approved by the governor, or approval omitted under circumstances defined in Sec. 16 of Article 3 of the Constitution, it is conclusive that it has been properly enacted and has become a valid statute of the state, accomplishes this, and we need only add that, in consequence thereof, chapter 214 of the 33rd general assembly, not having been signed by the speaker, is not and never was a part of the laws of this state.—*Affirmed.*

DEEMER, C. J., EVANS, GAYNOR, PRESTON and SALINGER, JJ., concur.

WEAVER, J., takes no part.