WEBSTER v. CITY OF LITTLE ROCK.

1. STATUTES: *Unconstitutionally passed.*
   The courts may look beyond the enrollment of an act to the journals
   of the Legislature to see if the act was constitutionally passed. But,
   if admitting all that the journals affirmatively show, the act *may* have
   been properly passed, the courts should so presume and sustain the act.
   The power to annul an act of the Legislature as unconstitutionally
   passed is a dangerous one, and should never be exercised in the face of
   a reasonable doubt.

2. SAME: *Reading of bills in the Legislature: Change of title.*
   The Constitution of 1868 did not require bills in the Legislature to be
   read in full. It was sufficient to read them by title; and a change of
   title in the House before the last reading, into another indicating the
   same bill, did not impair the constitutional passage of the bill.

APPEAL from *Pulaski* Chancery Court.

Hon. D. W. CARROLL, Chancellor.

*Geo. W. Carruth* for appellant.

1. The act of April 28, 1873, was not constitutionally
passed. The reading *by title* only is not sufficient. The
journals show this *affirmatively.* It was *never read in the
Senate at all. Sec. 21, art. 4 Const. 1868.*

2. The appellant's property is neither adjacent, adjoin-
ing or contiguous to the city within the sense of the act,
but is separated by a large tract.

*John H. Cherry* for appellant.

The boundary limits of the city, prior to April 28, 1873,
were fixed by public statutes and will be judicially no-
ticed. (*Dig. City Ord., pp. 76-8.*) The power to fix the
boundaries is vested in the Legislature. (*Const. 1868, art.
5, sec. 49; Const. 1874, art. 13; Cooley Const. Lim., sec. 191, et
seq.*) And that power cannot be exercised by the judiciary.

(*Const., art. 4.*) The intimation to the contrary in *36 Ark., 177*, is not well considered.

The pretended act of April 28, 1873, did not constitutionally pass either house. (*Const. 1868, art. 5, sec. 21.*) It had only *one reading*, the third; the first and second being of a local or special bill to extend the corporate limits of Little Rock. It nowhere appears how the change of title occurred. In the Senate the bill *was never read, except by title.* (*Cooley Const. Lim., p. 139; Dillon Mun. Cor.; 7 Vt., 471; 10 Ib., 480.*) Municipal boundaries must be fixed and certain (*supra*), and this act was void for uncertainty, and the city council had no power to amend it so as to make it certain.

It was clearly repealed by section 94, act of March 9, 1875. *Acts 1875, p. 39; Gantt's Dig., secs. 3318, 3328.*

*W. L. Terry,* city attorney, for appellees.

Plats and bills of assurance *speak for themselves*, and it is not competent for the maker to prove by parol that his *intention* was something else. (*36 Ind., 331.*) These lands *were* subdivided into lots, blocks, etc., and it was clearly within the power of the Legislature to declare that adjacent territory so subdivided should become a part of the city. (*1 Dillon M. C., sec. 185.*) As to the rule in regard to lands available *only for agricultural purposes*, and its limitations, etc., see *Cooley on Taxation, p. 120; Martin v. Dix, 52 Miss.; 6 Neb., 54; 5 Dillon C. C., 443; 34 Iowa, 195.*

After the passage of the act of 1873 the people of Lincoln's Addition *acquiesced* in the fact that they were in the city, as did also those of the other additions, paid city taxes, voted in the city, and were exempt from road duty, etc. As to the effect of this see *13 La., p. 47; 13 Gratt., Va., 389.*

As to the *dedication* of the streets in said additions, see

*Dillon M. C., vol. 2, secs. 628, 636; 11 Ill., 554; 36 Penn. St., 58–9; 29 Iowa, 73; 23 Penn. St., 200; 26 1 b., 187.* As to the effect of *building upon lines of streets* and acquiescence by adjoining owners. *5 Taunt., 125; 2 Smith L. C., 176; 3 Zabr., 23; N. J. L., 712.*

As to effect of *sale of lots with reference to plats, 2 Dillon, sec. 640; 37 Ind., 229; 24 La. Ann., 194; 49 Tex., 347; 23 Mich., 173; 59 Ill., 198.*

The act was constitutionally passed. It was the *same bill*, with merely a change of title to make a *general* instead of a *special* bill, and amended so as to make it apply to *all* cities of the first class. Reading by title is equivalent to reading at length, but under the Constitution of 1868 bills were not required to be read *at length*, as under the Constitution of 1874. *28 Ark., 317; 36 1b., 166; 40 1b., 206; sec. 22, art. 5, Const. 1868; Bentham Pol. Tac., 11, 353; 32 Ark., Worthen v. Badgett; 33 1b., 17.*

The objection that the act is void for uncertainty is disposed of by *36 Ark., 173, 177*, as is also the point that the act is repealed by section 94, act of March 9, 1875. *1b., p. 170.*

Ordinance No. 5, June 5, 1881, was an *official acceptance* under the act by the city. It was *an official direction* to the county clerk to do his duty. *Dillon M. C., vol. 2, sec. 641.*

EAKIN, J. Webster, in behalf of himself and others who are residents and taxpayers, in a certain district of land described as S. E. qr. of section 4, in T. 1. N., of R. 12 W., filed this bill on the fifteenth of April, 1882, against the county collector and the city of Little Rock, to enjoin the collection of city taxes in that territory, on the ground that it was not within the proper city limits.

The complaint alleges that the said quarter section lies just west of the city limits, and that the collector has in

his hands lists with items of city taxes extended upon said lands, and that he is proceeding to collect them under the pretended authority of an "act to provide for adding territory to cities of the first class," approved April 28, 1873, and of a city ordinance of June 7, 1881, which assumes to include within the corporate limits various tracts in the vicinity, naming some of the subdivisions into which said tracts had been divided, such as "Lincoln's Addition," "Faust's Addition," and "Marshall & Wolfe's Addition," and directing the county clerk to include them in the tax books as city property, to be taxed as such. He says that the city had no power to pass such ordinance, and that the same is in these respects void.

With regard to the act of the Legislature, he says that it was never constitutionally passed, and sets forth in detail the alleged defects in the manner and form of its passage. He says, moreover, that the first section of the act is void for uncertainty, as it proposes to change the former boundary lines of the city, and fixes definitely no other boundary, nor tribunal to establish it; and because it does not prescribe the size of the tracts to be added, or of the lots or blocks into which they might be subdivided, nor authorize any tribunal to do so. He says that of the tracts of land that were then contiguous to the city according to its existing boundary lines, some, in large bodies, belonged to individual owners, whilst others adjacent to these, but still more remote from the city limits, had for convenience of description, and by numerous partitions, been divided up into tracts and lots of almost every conceivable shape and size, from forty acres to the fraction of an acre named "lots" or "blocks;" but these terms, as applied to such suburban parcels, designated no particular quantity of land; and they are so situated that it would be impossible

to embrace them within the city limits without taking in also lands not subdivided.

The complainant says, further, that the said quarter section, prior to February 2, 1857, had belonged to the estate of L. R. Lincoln, who had conveyed ten acres of it to the Catholic Church out of the eastern portion on the eastern line contiguous to the city to Henry Jacobi. At that date Peter T. Crutchfield, as commissioner of the Chancery Court, divided the remainder of the lands into what he called in his report "lots and blocks," the lots being seven and one-half and ten acres in extent, and the blocks of smaller dimensions. A plat of these divisions was recorded, in which the east half of east half of said southeast quarter appears subdivided into the smaller tracts called "blocks," which blocks he at that date conveyed away, a part to the State and the remainder to individuals, without any reservation or dedication to the public of any part of the lands for streets, alleys or highways. These divisions of the east half of east half of said quarter section have remained the property of the State and individuals as thus conveyed. Taken with the east half of the Catholic Church tract they form a tract extending for half a mile along the western boundary of the city, between it and the remaining portion of the southeast quarter of section four. Southward, along the western boundary of the city in section nine, the lands were not then divided into lots, nor claimed to be in the city limits. They have since been partitioned amongst heirs. On the north the lands along the western boundary of the city belong to the State, and have never been laid off into streets and alleys. The complainants and other inhabitants of the said southeast quarter of section four, or the remaining parts of it, have no access to the city on its west side by any street or alley way.

In the year 1867 Marshall & Wolfe were the owners of the southwest quarter and a part of the south half of the west half of the southeast quarter of section four, and for convenience of making conveyances subdivided their tract into small portions or blocks, under the name of "Marshall & Wolfe's Addition," and dedicated the lands lying between the blocks to the county for highways. This with bill of assurances was recorded.

Afterwards, on the fifteenth of January, 1871, John W. Faust, who owned the remainder of the southeast quarter, for like reasons and purposes, subdivided his lands and made a like dedication of streets to the public, but not to the city, calling it "Faust's Addition," which was also recorded. It is alleged that neither of said owners intended or desired to annex the lands to the city, and made no dedication of streets to the city; nor has there ever been any petition made, either by the inhabitants of the district or the city, to include the lands in the city limits, nor has any court ever adjudged that they did or should constitute a portion of the city, but on the contrary the inhabitants have always been opposed to it.

He says it would be unjust to the inhabitants of said southeast quarter of section four to annex them to the city. It is sparsely settled, being in large part open commons; is more than a mile from the business portion of the city; is well adapted for suburban residences for those desiring grounds, orchards, gardens, and other conveniences of country life, and is so used so far as used at all. Their necessities do not require a government appropriate for dense population, and they are too remote from the city to be within reach of the convenience of gas, water facilities, protection by police, and from fire, etc., etc. That, in short, they would have the burdens without the

benefits of the city government, and that they are peaceable folks and need no police regulations.

He says, further, that the southeast quarter of four was not, under the circumstances, within the purview and intent of the act of 1873. Further, that no assessment of city taxes was ever made, or pretended to be made, for 1880 until after the passage of the city ordinance of June 7, 1881, and then was only made by the county clerk in extending city taxes against the property on the county tax books. During the whole of 1880 the city government did not claim jurisdiction over the territory in any way, or expend anything on it; nor did the inhabitants vote in city elections or participate in municipal affairs; but, on the contrary, were compelled to perform country road and other duties.

On the fifth of May an interlocutory injunction was ordered as prayed, and the city of Little Rock submitting to the court, upon the law, the questions upon the validity of the act and ordinance as to the rest answered :

That long prior to the second of February, 1857, Lemuel R. Lincoln owned the quarter section in question, and made a plat of the east half of the east half of the same, upon which the land was divided up into blocks, lots and streets, corresponding with those of the city, the streets being continuations of the city streets under the same names. This was called Lincoln's Addition, and a sale of a block of land to Jacobi was made with reference to it. Lincoln died without having recorded the plat. It came to the hands of Crutchfield, his administrator, with the will annexed, who made application to the Chancery Court for power to sell the lands to carry out the trusts of the will. The court was satisfied of the existence of the plat and division, and directed Crutchfield, as its commissioner, on making sales to sell so much of the east half of the quarter section as Lincoln had laid off

in blocks and lots as an addition to the city, by the num-
bers and descriptions designated in Lincoln's plat, and to
sell the residue of the quarter section in ten or twenty
acre parcels as he might deem most advantageous. Where-
upon Crutchfield did sell all the blocks in said Lincoln's
Addition by that division and with reference to the streets,
partly to the State and partly to individuals. This sale
was reported by Crutchfield, as such commissioner, with
a copy of Lincoln's plat attached thereto. The streets,
with a few exceptions, have since been open to the public
and used by it, and afford access to all persons coming into
the city from "Marshall & Wolfe's Addition" and "Faust's
Addition," and are within the jurisdiction and power of
the city to keep them open. This addition was consid-
ered by the inhabitants, and by the city, and by the county
authorities as within the corporation, until the passage of
an act of the Legislature in March, 1877, defining the
boundary lines of the city, during which time the citizens
of the addition paid city taxes, were allowed to vote in
municipal elections, and were exempt from road duty.

Further, that the streets laid off in Marshall & Wolfe's
Addition, although dedicated to the county, were made
in all respects to correspond with the streets through
Lincoln's division, continuing them westward. The same
allegations are made regarding "Faust's Addition," in
which the streets were dedicated to "the public." It is con-
tended that all these became part of the city by force of
the act of 1873, and were so treated, in all respects, by
the inhabitants of said additions, and by the county and
city authorities.

The city taxes for 1880 were not extended over these
areas from a mistake of the clerk, who supposed they had
been cut off by the act of 1877 defining the boundaries.

This act having been declared unconstitutional, the county clerk was instructed to extend taxes over them again.

Depositions of witnesses tended to show that the streets through Lincoln's Addition had been kept open, affording free passage to and fro, to all inhabitants of the other additions, and that they had enjoyed some of the advantages of the city government, and participated in it up to the time of the passage of the act of 1877.

An agreement of counsel, too long for insertion, sustains the answer substantially with regard to the origin of Lincoln's Addition, the plat and the continuation of the streets, with other matters which will be referred to, if necessary, subsequently in this opinion. Also with regard to the extension of the streets through Lincoln's Addition, although some of them had been stopped by individuals, and the habit of conveying between owners of property there by the numbers and designations of Lincoln's plat. It shows also that although the inhabitants of Lincoln's Addition had been brought within some of the advantages of water and street cars from proximity, they had never had water or gas pipes. It is also agreed that none of said additions were ever brought into the corporation by virtue of a petition of the inhabitants, or by any action of the city corporation, directed to that purpose; but if parts of the city were made so by the results of the facts and circumstances under the operation of law.

Marshall testifies that it was not the intention of himself and Wolfe, in making their plats, to effect an incorporation with the city, but the division was for convenience of description in sales, and that the streets were dedicated to the county to give purchasers a right of way to their several parcels. He thought, then, that there could be no incorporation with the city without a petition by a majority of the occupants, and they so represented

to purchasers. He says that a large portion of that addition, and of Faust's Addition, continues unoccupied, covered with copsewood, and with roads running over it at will. They have had no police protection, nor any from the fire department; and while inhabitants have spent much in improving the streets, etc., the city has spent nothing.

It is shown by agreement of counsel, that in 1881 Marshall petitioned the city council for a grant to himself and others to run a street railroad through the streets of the city and of Marshall & Wolfe's addition, and that he had acted as chairman of ward meetings in the city, and voted in a ward of the city at general election, and acted as a judge of election.

The Chancellor, upon hearing, held that Marshall & Wolfe's and Faust's Additions were part of the city of Little Rock, but for divers equitable reasons made the injunction perpetual as to the taxes of 1880, dissolving it as to all else. Lincoln's Addition is not named in his finding, but the effect of the decree is the same upon it as the others. The costs were divided between the parties. The complainant appealed.

A sufficiently clear idea of the relative location of the tracts may be obtained from this plat, the lands granted to the Catholic Church by Lincoln being omitted as unimportant—also lands of the State:

Southeast of section 4 in township 1 north, of range 12 west.

The streets leading westward from the city are mostly extended by the plats of the additions through all of them.

The Constitution of 1874 authorized the Legislature to provide, by general laws, for the organization of cities and incorporated towns. (*Article 12, section 3.*) At the first session of the Legislature a general incorporation act was passed, the fifth section of which adopted and classified all corporations which existed when the Constitution took effect, with their territorial limits as then, by law, existing. (*Pamphlet Acts of 1874–5, p. 4; Mans. Dig., sec. 729.*) To determine, therefore, whether the southeast

quarter of said section four is a part of the city we must look to the condition of things as existing on the thirty-first of October, 1874, the date of the adoption of the Constitution.

Under the former Constitution of 1868, which also provided for such general laws, an act had been passed on the twenty-eighth of April, 1873, providing for the addition of territory to cities of the first class. (*Acts 1873, p. 287.*) As the whole right of the city to collect the tax rests upon the construction of this act, the first question is upon its validity.

The appellant urges that, by the Constitution of 1868, it was requisite that the bill should have been read three times on different days in each house, unless the rules be suspended. 1. STATUTES: Passage of.

The facts with regard to this bill appear to be, as affirmatively shown by the journals, that on the fourteenth of April, 1873, the bill was introduced in the House of Representatives, marked and numbered "H. R., 343," and entitled *"An act to extend the corporate limits of the city of Little Rock."* Under suspension of the rules it was read a first and second time by title. On the seventeenth a bill marked and numbered "H. R., 343," but entitled *"An act to provide for adding territory to cities of the first class,"* was read a third time and passed. It was transmitted to the Senate, and there, on the seventeenth of April, was by the title last given, read a first and second time *by title* and referred to a committee. On the twenty-third of April, without suspension of the rules, it was read a third time by title and passed.

It has been gravely questioned whether or not the American courts have done wisely in departing from the English rule regarding the recognition of statutes. There, where the Parliament is trammeled by no consti-

tutional restrictions, and may adopt its own modes of originating and perfecting bills, I understand the rule to be, that the existence of a public act is a question of law, requiring no proof, and that in advising themselves as to the law the judges will not look behind the enrollment of an act properly authenticated. Of course an act surreptitiously enrolled would not come within the rule. In a few of the American States this rule has been adopted in its fullest rigor. See case of *Sherman v. Story, 30 Cal., 253,* in which the American authorities are reviewed and compared, and the conclusion reached that an act of the Legislature properly enrolled, authenticated and deposited with the Secretary of State is conclusive. Also case of *State v. Young,* in New Jersey, reported in *5th vol. Am. Law Reg., p. 679, N. S.; Evans v. Brown, 30 Indiana, 514.*

The legislative department of the government is equal in dignity with the judicial—co-ordinate and not subordinate. Its officers take the same oath to support the Constitution. The constitutional provisions regarding the manner in which bills are to be passed are addressed directly to them, and they are responsible to the people for an abuse of powers. No human government can be devised in which powers must not be somewhere reposed which may be abused. It is not irrational to hold that, when a legislative body has put forth a bill meaning to do so, and that bill has been duly authenticated in the prescribed manner, then the common safety of law-abiding citizens requires that the court should respect it as law, without inquiring into the modes of its passage. It is this consideration which lies at the foundation of the rule everywhere recognized, that no law can be impeached for fraudulent motives actuating the legislators, nor on account of corrupt influences brought to bear upon them.

There is another line of decisions in which this State is

already ranged, which maintains the power and makes it the duty of the judges, in advising themselves of the validity of an act, when it may be questioned, to go behind its enrollment and authentication, and look into the journals to see if the constitutional requirements have been respected in its passage, and to annul it if they have not. This was first done in the case of *Burr v. Ross*, *19 Ark.*, *256*, for the purpose of ascertaining that a bill purporting to be a law, and printed as such, was ever passed at all. This was, in fact, a determination that the printing was a simple mistake, and does not conflict with the English line of authorities. It affirmatively appeared that the bill had been indefinitely postponed, and by usage it followed that it was never taken up again. The practice of referring to the journals has since obtained upon the bench, and in several cases it has been done to ascertain if the legislative body in putting forth a law which it really meant to enact, and considered as enacted, had neglected or violated any essential provision of the Constitution, regulating legislative proceedings. This may now be considered as settled, and we may examine the journals with regard to the act in question.

But there are very potent considerations pressing upon the court to refrain from declaring a statute null on this account, unless it should plainly appear beyond any cure by reasonable presumptions, that the Constitution has been violated in an essential point. If admitting all that the journals *affirmatively* show, the act *may* have been properly passed, then deference to a co-ordinate department, and a regard for those who make the published and authenticated acts of the State their rule of conduct requires that the presumption be entertained by the courts to its fullest extent. In other words the power is a dangerous one, and should never be exercised in the face of a

Presumption in favor of the act.

reasonable doubt. Conforming to the practice of the court, I desire at the same time to express my preference for the English doctrine, with which I do not consider our case of *Burr v. Ross* in conflict. That is to say that an act, actually and *bona fide* assented to in both houses, authenticated and deposited with the Secretary of State, should be conclusive of the law, in the breasts of the judges.

2. READING BY TITLE: Change of title.

Considering ourselves at liberty, however, from subsequent rulings to question the validity of this statute upon the ground of neglect of constitutional directions as to the mode of its passage, we find the only objections urged to the House proceedings to be, that it affirmatively appears, that one bill was read twice by title, and the *same* bill was read a third time by a different title. The title was changed between the second and third reading. That it was the *same* bill is sufficiently clear from its mark, number and subject matter. It was simply changed from a special to a general law. But the title by which it was each time read, indicated the same bill, and it was really read three times by the title which then belonged to it. If I lend my horse to James twice, and he then changes his name to Henry, and I lend him my horse again, I may truthfully say I have lent Henry my horse three times.

The objection to the Senate proceedings is, not that the bill with the new title was not the same bill that was read each time, but that it was never read in full at all. It was not necessary that it should be. The Constitution of 1868, then in force, did not require it. The language is that every bill and joint resolution shall be read three times, on different days, in each house, etc. To read by title is by universal parliamentary usage considered a reading of a bill, unless reading *in full* be specially required. This

is done by the subsequent Constitution of 1874, which requires bills to be read "at length."

It would destroy all confidence in legislation if the judges should subject the members of the Legislature to such martinet regulations as to require all their proceedings to be in rigid form. Most of the members are not lawyers. The act of April 28, 1873, became a law. Its first section provides that:

"All tracts of land or territory which adjoins, or is adjacent or contiguous to a city of the first class, and which is or shall be laid off or subdivided into lots or blocks, or additions, shall be, and the same is hereby declared to be a part of such city, and shall be subject to all the power, authority, jurisdiction, franchises, liabilities and ordinances governing such city, and such territory shall become incorporated with and a part of said city."

Appellant contends that this is too obscure to be intelligible, and therefore void. He says that neither the extent of the additions, nor the shape and size of the lots and blocks are designated. These terms must be construed with reference to the subject matter. The area of the additions is purposely left undetermined. They may be of any size. Lots and blocks mean such lots and blocks as are appropriate to cities—such as cities usually have, for convenience in city uses, for arrangement into groups, with streets and alleys between which may be larger or smaller in different cities, or different parts of the same city, subject to the general convenience. They are easily distinguishable in their nature from rural subdivisions for agricultural purposes, and from divisions for partition. Each case must be judged by its own characteristics in determining whether the divisions were made with a view to urban or rural objects. So considered, it is plain enough, from the proof, that all three of these additions

were so divided as to become city property, and fall within the law.

It makes no difference that any parts of them were mere copsewood and remain so. The Legislature acts without assent of proprietors in establishing municipal governments within the State. Its reasons may not be questioned. If the contiguous additions were subdivided as the statute prescribes, they were swept into the corporation by the *vis major* of the act.

It is more plausibly urged that the statute does not contemplate a "boundless contiguity" of different additions, all having separate existence when the act was passed. But that the several additions are to be considered as separate units, or distinct territories, and the statute only applies to those lying adjacent to the city line, and not those which "*co instanti*" did not adjoin the city until the act took effect upon intervening additions, thus carrying out the city lines to make the contiguity. This question does not seem quite clear of doubt, inasmuch as it could not be said when the act was passed, that either Marshall & Wolfe's or Faust's addition was adjacent or contiguous to the city, although Lincoln's was. The result of this construction, however, would be against the policy of the act, which seems to have been to prevent the accumulation around the suburbs of cities of the thickly settled districts not under the city control. The effect of dividing these suburban districts into lots and selling them to different parties would be to encourage such dense collections, and the good order of the city could not well be preserved, if it were ringed round with a population independent of its regulations. The construction contended for would lead to just this state of things, for if the statute did not operate at once on these remote additions it could not afterwards.

The statute makes no mention of separate additions made and owned by different parties under different plats and dedications. It seems to contemplate the whole platted district without regard to the lines of separate dedications, or the time at which they had been made.

We think that by the act the territory in question became subject to the city control, and city taxation, and that the Chancellor committed no error prejudicial to appellant.

Affirm.