(No. 22000.—

EDWARD J. LEHMANN *et al.* Appellees, *vs.* ALEXANDER H. REVELL, *et al.*—(THE COMMISSIONERS OF LINCOLN PARK *et al.* Appellants.)

*Opinion filed December 22, 1933.*

JAMES M. SLATTERY, SHORTALL & MURISON, THOMAS G. E. PARADIS, and BAYLEY, MERRICK, WEBSTER & GREGORY, (WILLIAM H. BECKMAN, and GEORGE E. WOODS, of counsel,) for appellants.

WILSON & McILVAINE, JUDAH, REICHMANN, TRUMBULL & COX, WINSTON, STRAWN & SHAW, ROBERT McCORMICK ADAMS, CHARLES J. FAULKNER, A. B. STRATTON, MAYER, MEYER, AUSTRIAN & PLATT, KIRKLAND, FLEMING, GREEN & MARTIN, and COOKE, SULLIVAN & RICKS, (CLAY JUDSON, ARTHUR M. COX, and JAMES H. CARTWRIGHT, of counsel,) for appellees.

Mr. JUSTICE SHAW delivered the opinion of the court:

This is a direct appeal from the superior court of Cook county seeking to reverse a decree of that court which quiets the title of the complainants as to the removal of certain building restrictions on property in Chicago bounded on the north by Belmont avenue, on the south by Diversey parkway, on the east by Lake Shore drive, and on the west by Sheridan road and Commonwealth avenue. The controversy arose out of the facts hereinafter stated.

In 1895 the legislature of Illinois passed an act entitled, "An act to enable park commissioners having con-

trol of any park bordering upon public waters in this State
to enlarge the same from time to time, and granting sub-
merged lands for the purpose of such enlargement and to
defray the cost thereof." (Cahill's Stat. 1933, chap. 105,
pars. 187, 188.) This act provided, in substance, that in
certain cases where a public park bordered upon public
waters, the commissioners of such park might have power
to enlarge the same by reclaiming submerged lands under
such public waters, and, upon compliance with the act,
granted title to the land under the waters to the park com-
missioners in fee simple for park purposes. The act also
provided that the park commissioners might obtain the
riparian rights of the adjacent owners by contracts with
the owners or by deeds from them, or, in case of inability
to agree, by condemnation proceedings. It also provided
for a chancery proceeding to be had in such cases to de-
termine and permanently establish the boundary line be-
tween the park and the property of adjacent owners who
might have conveyed or been deprived of their riparian
rights by deed or condemnation. Pursuant to the pro-
visions of this act, and its later amendments, the Com-
missioners of Lincoln Park prepared and adopted a plan
for the extension of that park in a northerly direction
in exact conformity with the terms of the statute. They
located on such extension an outer boulevard or driveway
to run upon filled land in Lake Michigan, and in the plan
provided for the reclamation of the submerged lands abut-
ting upon the property hereinafter described. The plan
in general fully complied with the terms of the statute.
In order to carry out this plan, and under date of July 1,
1904, the commissioners made with the then owners of
the riparian rights nine different contracts necessary to its
completion, in which it was agreed on the part of the com-
missioners, among other things, that they would build a
driveway between Diversey parkway and Belmont avenue,
together with a sidewalk of a certain width, a grass plot

of a certain width and in accordance with other detailed specifications and requirements in the agreements set forth. Each of the nine agreements signed by the property owners contained the following restrictions and prohibitions, together with certain provisions for the release thereof, in the following words and printed in the following form:

*"The party of the second part, in consideration of the performance by the party of the first part of the agreements and conditions herein contained, agrees as follows:*

"That all buildings erected or constructed upon lots abutting on said boundary or dividing line to be established as hereinbefore set forth shall face said boundary or dividing line, and the easterly wall or face of all such buildings shall be approximately parallel with said boundary or dividing line;

"That no building shall be erected on any lot or parcel of land bounded on the east by said boundary or dividing line of a greater height than 60 feet from the surface as herein fixed or the ground at the said boundary or dividing line to the highest point thereof, exclusive of chimneys;

"That no theater, hotel, church, livery stable, school house, apartment, flat or office building, warehouse, business block, factory, restaurant or music hall shall be erected on any lot or parcel of land bounded on the east by said boundary or dividing line to be established as hereinbefore set forth and on the west by a line parallel thereto and one hundred and fifty (150) feet therefrom, nor shall any building or part thereof erected within said boundaries be used as a saloon, beer hall, concert hall, road house, theater, hotel, church, public restaurant, livery stable, school house, apartment or flat-building, warehouse, factory, office building, music hall or business block: Provided, however, that none of the restrictions or prohibitions in this paragraph contained shall be modified, changed or altered, nor shall the property of the party of the second part hereinabove

described be released from any of said restrictions or prohibitions, except upon the joint written agreement of the said Commissioners of Lincoln Park and the owner or owners of a majority, in frontage, of the lots which abut on and lie immediately west of the said boundary or dividing line between Diversey and Belmont avenues, and which, by agreement with the party of the first part herein, are subject to substantially similar restrictions and prohibitions, it being agreed that all contracts entered into between the party of the first part and the owner or owners of land lying on the shores of Lake Michigan between the avenues aforesaid shall contain restrictions and prohibitions similar in character to those in this paragraph set forth;

"That a good and sufficient deed or deeds conveying to the Commissioners of Lincoln Park the riparian rights pertaining to the above described property shall be executed by the party of the second part and shall be placed in escrow with the Chicago Title and Trust Company upon the entry of the decree hereinabove mentioned;"

Following the due execution and delivery of these various agreements upon the conditions named in them, the statutory proceedings provided for by the act above quoted were had in the circuit court of Cook county, resulting in a confirmation of the agreements and the determination of the boundary line between the private owners and the park. All owners of riparian rights were parties to and bound by this decree and it is not questioned here.

The west boundary of Lincoln Park, which is at the same time the east boundary of the land owned by private owners between Belmont avenue and Diversey parkway, has a total frontage of privately owned property, measured along the irregular curvature thereof, of 2330.96 feet. There is a strip of frontage 18 feet in width lying between Oakdale avenue and Surf street the title to which is in dispute and about which much testimony was taken.

In the view which we take of the case it will not be necessary to determine the ownership of this property.

On the 26th of January, 1927, in a contract purporting to have been made pursuant to the provisions of the original agreements of 1904 above set forth, the owners of 1817.01 feet of frontage abutting on the western boundary of Lincoln Park joined in a contract with the Commissioners of Lincoln Park for the purpose of modifying the restrictions in the prior agreements. That contract, in so far as it is material here, contains the following paragraphs:

"That said restrictions and prohibitions established or agreed to in said several agreements bearing date July 1, 1904, and relating to the property lying west of the west boundary line of Lincoln Park as heretofore established, between Diversey avenue and Belmont avenue extended, are hereby modified, changed and altered so that hereafter said restrictions and prohibitions shall apply only to the property next hereinafter described and shall be in force only to the extent next hereinafter set forth, to-wit:

"That all buildings erected or constructed on any lot or parcel of land bounded on the east by the west boundary line of Lincoln Park between Diversey and Belmont avenues extended, and on the west by a line parallel thereto and one hundred fifty (150) feet distant therefrom, shall face said boundary or dividing line, and the east wall or face of all such buildings shall be approximately parallel with said boundary or dividing line; that no theater, church or livery stable, school house, office building, warehouse, business block, factory or music hall shall be erected on any lot or parcel of land bounded on the east by said boundary or dividing line and on the west by a line parallel thereto and one hundred fifty (150) feet distant therefrom, nor shall any building or part thereof erected within said boundaries be used as a saloon, beer hall, concert hall, road house,

theater, church, business block, livery stable, school house, warehouse, factory, office building or music hall, except that hotels and apartment buildings may be erected thereon and except that any part or parts of any hotel or apartment building erected thereon may be used for such purposes, and also for such other purposes as are usual in high-grade hotel or apartment buildings: Provided, however, that any of the restrictions or prohibitions in this paragraph contained may be modified, changed or altered or the property be released therefrom upon the joint written agreement of the then Commissioners of Lincoln Park and the then owner or owners of a majority, in frontage, of the lots which abut on and lie immediately west of the said westerly boundary line of Lincoln Park between Diversey and Belmont avenues extended.

"That all of the property described in said several and separate agreements bearing date July 1, 1904, is hereby released and discharged from all of the restrictions and prohibitions imposed by said agreements bearing date July 1, 1904, except to the extent, only, that certain of such restrictions and prohibitions as in the next preceding paragraph modified and therein particularly specified are continued in force as to said property last hereinabove described in said next preceding paragraph hereof."

In order to understand the controversy fully, it is necessary to note certain changes in titles and boundaries since the original agreements of 1904 were executed. At that time the signers of the various agreements of that date owned all of the property from the lake front westerly to Sheridan road, then called Lakeview avenue, except that part thereof which was south of Oakdale avenue, and except a parcel fronting 150 feet on Wellington street by 198.65 feet on Lakeview avenue, at the southeast corner of that intersection. South of Oakdale avenue the signers

of the agreements owned the property from the lake front west to Commonwealth avenue. The following plat shows the property as it was at the time the agreements were made, in 1904:

Since the making of the original agreements of 1904 the property has been divided into more convenient and desirable sizes and shapes for practical and commercial use by the subsequent and present owners. At the north end, between Belmont avenue and Briar place, there appear to be three lots, divided by easterly and westerly lines running all the way through from Lake Shore drive to Sheridan road. In the next block south, between Briar place and Barry avenue, there are three lots, varying in depth from 150 to 250 feet, fronting on Lake Shore drive. Another, 315 feet long north and south and from 87 feet to 100 feet in width east and west, fronting on Sheridan road, and between the Sheridan road property and the Lake Shore drive property two other lots having their greatest length north and south, one of them 87 feet in width fronting north on Briar place, and another 100 feet in width fronting south on Barry avenue. In the next block south, between Barry avenue and Wellington street, there are three lots, 200 feet in length east and west, fronting on Lake Shore drive, two of them approximately 105 feet in width and the other 154 feet in width. Directly west of these three lots, fronting north on Barry avenue, there are three lots, each 165.95 feet in length north and south and 115 feet, 80 feet and 73 feet in width, respectively. In the south half of the block, fronting south on Wellington street, there are six lots, each 165.95 feet north and south and 50, 60 and 100 feet in width. In the next block south, between Wellington street and Oakdale avenue, four lots have been laid out fronting on Lake Shore drive and extending back therefrom approximately 200 feet, these lots varying in width from 50 to 113 feet each. To the west of these lots are several lots fronting north and south on Wellington street and Oakdale avenue, respectively, varying in width from 50 to 173 feet each, bounded on the west by an 18-foot alley, and west of this alley two other lots, facing west on Sheridan road. From Oakdale avenue

south to Diversey parkway none of the property in question approaches Sheridan road. These two blocks are laid out in lots fronting entirely on Lake Shore drive and extending back various distances, from 405 to 230 feet in depth, the rear of each of the lots being the easterly line of Commonwealth avenue.

It is apparent from this description of the properties and from the maps submitted to us that the various tracts included in the nine separate agreements above mentioned were at great variance with each other as to their depth, their relation to Lake Shore drive, their relation to Sheridan road and their relation to the intervening east and west streets, upon which some of the properties must necessarily find frontage in order to have any commercial value.

In the trial court the prayer of the bill of complaint was granted, the finding of the master in chancery for the complainants was fully confirmed and a decree entered in accordance with the relief prayed for. The court found and adjudged that the restrictions created by the agreements of July 1, 1904, had been validly modified by the subsequent agreement of January 26, 1927, and that the only restrictions continued in force after the latter date were those therein contained, and all other restrictions were removed as clouds on the title to the real estate of the complainants and title quieted in them as against all restrictions in the July 1, 1904, agreements, except as modified. The owners of all of the property in the district were parties to the suit, and upon the trial of the case some of the defendants owning several hundred feet of the lake shore frontage aligned themselves with the complainants. The only defendants objecting to the relief herein given who own any property in the district are the owners of certain lots on Barry avenue, having a total frontage of 233 feet on that avenue. None of that property is nearer than 200 feet to Lake Shore drive and none of it is nearer than 100 feet to Sheridan road.

It is contended by the appellants that the Commissioners of Lincoln Park had no legal authority to execute the agreement of January 26, 1927, and that it would require a special act of the legislature to authorize them to do so. They also contend that the depth of lots, which constitutes frontage, means lots extending all the way west from Lincoln Park to Sheridan road as they were on July 1, 1904, and that even if the commissioners had legal authority to enter into the modifying agreement they could not abrogate or modify the limitations and restrictions as to the height of any building to be erected, contending that the provisions restricting the height of any building are in a separate paragraph from that containing the provisions for modification or release, and that therefore the height restrictions could not be reached by the modifying agreement. The appellants also contend that a proper construction of the agreements of 1904 shows an intention to create cross-easements as much for the benefit of the property abutting on Sheridan road as for that abutting on the park boundary line, and that the owners in 1904 could not legally sell or convey a back portion of their property, retaining a strip along the lake shore, and then vote to modify the restrictions so that apartments can be erected between the property sold and the park.

The appellees on their part contend that the release was executed in exact accordance with the terms upon which the property was acquired; that the statute fixing the procedure for the sale of land not exceeding one acre in area not needed for park purposes has no application, and that the commissioners cannot now repudiate the agreements by which they obtained the property. They further contend that if the conditions upon which the release might be obtained are to be held invalid, then the restrictions themselves are invalid and the decree would be sustainable on that ground. They also contend that a proper construction of the word "paragraph" places the restriction as to

use and height in one and the same paragraph, and that if their contention in this respect is not right, then there is no restriction at all as to any owner releasing his property from the restrictions by an agreement with the Commissioners of Lincoln Park without anyone else joining at all. They further maintain that there are no cross-easements, there being no evidence of any general plan or any common grantor. These general propositions will be discussed in the order above outlined.

Paragraph 154 of the Park act (Cahill's Stat. 1933, chap. 105, p. 1993,) being the act of June 16, 1887, provides a procedure whereby park commissioners having control of a park and having any piece or parcel of land not exceeding one acre in area which is no longer needed for park purposes may sell it. The appellants contend that the restrictions imposed by the agreements in question gave rise to easements for light, air and view to Lincoln Park; that these easements are real estate, and that the board of park commissioners was entirely without power to release these easements, thereby conveying real estate, except upon compliance with this statute. This argument, if sound, would defeat its own purpose, as it is well established that where a municipal corporation has received benefits under a contract which is in part illegal, in that it exceeds the powers of the municipal corporation to make it, and not under some expressed prohibition of penal law, the law will not permit it to retain the benefits and defend on a theory of lack of powers. (*Chapman* v. *County of Douglas,* 107 U. S. 38.) If the appellants' theory is true, then the Commissioners of Lincoln Park in the agreements of 1904 secured properties upon a condition which they were without authority to perform—*i. e.,* the power to enter into a valid contract of release in accordance with the provisions of the original agreements. If the appellants contend that they took title to these easements upon a contract which it was impossible for them to perform, they bring themselves clearly

within the rule laid down by the Supreme Court of the United States in the case last cited. In that case the court used the following language: "The conveyance by Chapman to the county of Douglas passed the legal title, but upon a condition in the contract which it was impossible in the law for the county to perform. There resulted, therefore, to the grantor the right to rescind the agreement upon which the deed was made, and thus to convert the county into a trustee, by construction of law, of the title for his benefit according to the oft-repeated rule as stated by Hill on Trustees, 144, 'that whenever the circumstances of a transaction are such that the person who takes the legal estate in property cannot also enjoy the beneficial interest without necessarily violating some established principle of equity, the court will immediately raise a constructive trust and thrust it upon the conscience of the legal owner so as to convert him into a trustee for the parties who in equity are entitled to the beneficial enjoyment.' Upon this principle the vendor of real estate is treated as trustee of the title for the purchaser, and the mortgagee, having legal title, after payment of the mortgage debt is a trustee for the mortgagor. The analogy is complete between these and every case, of which the present is one, where the holder of the legal title is under a duty to convey it to another."

It is apparent that the statute providing for a method of selling property no longer needed for park purposes was not intended to apply to intangible rights or appurtenances, such as easements in light and air, and it is equally clear in the present case that if the Commissioners of Lincoln Park seek a benefit or advantage from any claim of incompetency on their own part to carry out their agreements, they can claim nothing more than to hold these easements for the use and benefit of the parties to whom they rightfully and equitably belong. It is as clear as it is just, that the commissioners cannot hold the benefits of the agree-

ments of 1904 while disclaiming their power to perform the very contract by which those benefits were acquired.

The second contention of the appellants calls in question the meaning of the word "lots" as used in the agreements of 1904, in the following sentence: "Provided, however, that none of the restrictions or prohibitions in this paragraph contained shall be modified, changed or altered, nor shall the property of the party of the second part hereinabove described be released from any of said restrictions or prohibitions except upon the joint written agreement of the said Commissioners of Lincoln Park and the owner or owners of a majority, in frontage, of the lots which abut on and lie immediately west of the said boundary or dividing line between Diversey and Belmont avenues, and which, by agreement with the party of the first part herein, are subject to substantially similar restrictions and prohibitions."

It is urged by the appellants that because the plats in evidence show that at the time of the agreements the lots extended from the water's edge westwardly to Sheridan road, it must be held that the meaning of the word "lots" relates back to the date of the contract, and that no frontage can be counted in determining whether or not a majority has been secured unless the signers of the agreements own not only the lake shore frontage, but all the way back, in a westwardly direction, to Sheridan road. It is stated in the appellants' argument that all of the plats in evidence show that all of the lots extended from the water's edge to Sheridan road, and that there can be no dispute as to this. Quite to the contrary, it plainly appears from the plats and from the record that a tract 150 feet by 200 feet at the southeast corner of Wellington street and Sheridan road was never included in any restrictive agreement, and that south of Oakdale avenue to Diversey parkway no restrictive agreement extended in

a westerly direction further than Commonwealth avenue. These facts are admitted in other parts of the appellants' argument. It must be conceded that if the argument advanced is sound, then the restrictions were from the beginning practically irremovable, because a glance at the map shows that a large portion of the property in the so-called "restricted district" must find frontage and outlet on the east and west streets to have any commercial value, and this situation must have been as apparent to the signers of the agreements at the time they were signed as it is at this moment.

Neither the appellants nor the appellees refer us to any authorities as to the technical or exact meaning of the word "lots," and from our own examination we are of the opinion that there is no fixed or inflexible rule which gives this word an exact meaning. The courts always read and interpret it in connection with the context and the circumstances under which it is used. The following cases, among many others which could be cited, illustrate the elasticity with which the term is applied:

In the case of *Aldrich* v. *Thurston,* 71 Ill. 324, in construing the Homestead Exemption law, providing that "the lot of ground and the buildings thereon occupied as a residence and owned by the debtor" shall be exempt, we held that a quarter-section of land, being a legal subdivision, could be considered as a lot.

In the later case of *Gardner* v. *Eberhard,* 82 Ill. 316, we held that this court would take judicial notice of governmental surveys of public lands; that a quarter-section of land consists of four forties, each with well defined bounds, and that if the value of the forty-acre tract on which the residence buildings are situated does not exceed $1000 in value it is exempt as a lot.

In the Maryland case of *Warner* v. *Miltenberger's Lessee,* 21 Md. 264, a testator by will devised his two lots of ground lying on the east and west sides of Lindenhall

street, and it was held that the word "lot" meant the entire tract of land owned by the testator lying west of Lindenhall street and extending through to the next parallel street, and was not confined to a single building lot as laid down upon the plat of the town.

In the Arkansas case of *Webster* v. *City of Little Rock,* 44 Ark. 536, it was held that the word "lot" must be construed with reference to the subject matter, and when used with reference to city property means such lots and blocks as are appropriate to cities and such as cities usually have for convenience arranged into groups, with streets and alleys between, which may be larger or smaller in the same or different cities, subject to general convenience.

In the Minnesota case of *Lundberg* v. *Scharvey,* 49 N. W. 60, it is held that "lot" is not synonymous with "tract or parcel," whereas in California the opposite has been held. *Harvey* v. *Meyer,* 117 Cal. 60, 48 Pac. 1014.

In a Minnesota case, *State* v. *Lewis & Co.* 72 Minn. 87, 75 N. W. 108, it would appear that under different circumstances the court construed the words as synonymous.

In the Missouri case of *Burde* v. *City of St. Joseph,* 110 S. W. 27, the court holds that the term "lot" does not necessarily mean the platted lot, and that in determining whether a given area of land is to be regarded as a lot all of the facts and circumstances of the particular situation should be considered.

The term "lots," as used in connection with urban property, is frequently defined as a subdivision of a block, according to the plat or survey of a town or city. (*Ontario Land Co.* v. *Bedford,* 90 Cal. 181, 27 Pac. 39; *Collins* v. *City of New Albany,* 59 Ind. 396; *Lake Erie and Western Railroad Co.* v. *City of Alexandria,* 153 id. 521, 55 N. E. 435.) Webster's Dictionary defines "lot" as "any portion, piece or division of land."

In the case of *Adams* v. *Gordon,* 265 Ill. 87, we held that "the object in construing and interpreting an instru-

ment is to ascertain * * * the meaning of the parties at the time it was made, and when a doubt exists * * * resort may be had to the circumstances surrounding its execution." We have also held that restrictions on the free use of property are not to be presumed or arrived at by strained constructions. If they exist they must be plainly expressed and clearly within the intention of the parties. *Labadie* v. *Morris,* 303 Ill. 321.

Having in mind, then, the various possible meanings of the word "lots," and the further point that we are making this construction for the purpose of determining to what extent restrictions have been imposed upon the free use of the property in question, it becomes highly important to examine the circumstances under which these nine agreements were originally made.

Looking first at the general lay-out of the entire plan contemplated by the park commissioners, it is at once apparent that they were primarily interested in riparian rights, and that their interest in this subject extended from Diversey parkway on the south along the entire length of the district to Belmont avenue on the north. It is next apparent that in connection with this project they were not interested in Sheridan road, because from Oakdale avenue south to Diversey parkway no attention was paid to any property west of Commonwealth avenue, which was at that time only a short distance from the then existing lake shore. Their limited interest is further apparent from the fact that no agreement was made with the owner of the tract at the southeast corner of Wellington street and Sheridan road, which is hereinabove referred to. The map approved by the circuit court on confirmation of these agreements shows the old line of the lake shore throughout the length of the district, and an approximately parallel but regular line to which the property owners are permitted to own upon completion of the project, being the westerly line of Lincoln park as extended. The next thing which

we note is the provision of the contract to the effect that none of the restrictions or prohibitions should be removed except upon the joint agreement of the Commissioners of Lincoln Park and the then owners of a majority, in frontage, of property between Diversey parkway and Belmont avenue, and which, "by agreement with the party of the first part herein, are subject to substantially similar restrictions and prohibitions." It is apparent that the construction contended for by the appellants would impose substantially dissimilar restrictions and prohibitions upon the different properties. It would be a much greater burden and restriction upon the property north of Wellington street to restrict it all the way through to Sheridan road and deprive it of any frontage possibilities upon Sheridan road, Briar place, Barry avenue or Wellington street, than it would upon the property south of Wellington street, where the southeast corner of the intersection of Wellington street and Sheridan road was not even included in the agreements, and where, from Oakdale avenue south, the property included extended back only as far as Commonwealth avenue. This obvious difference in the situation of the two ends of the district also disposes of the contention of the appellants that the plan was for the benefit of Sheridan road as well as the lake front.

Referring to the descriptions in the separate agreements, we find that there was no established plan or survey of this entire district at the time the nine agreements were made. Some of them described lots and parts of lots in the city of Chicago's subdivision of the northeast fractional quarter of section 28, township 40 north, range 14 east, some of them describe tracts by complicated description in metes and bounds, others as part of a government survey, bounded by certain streets, and, so far as the record shows, the only existing plat of the whole district at the time of the 1904 agreements was that one which was made under the decree of the circuit court confirming the agreements and

for the purpose of showing the old lake front in conjunction with the newly established boundary line. It would thus appear that the establishment of lot lines as such, through the making of this survey, was merely incident to the making of the agreements rather than a record of any previously established lot lines.

If we concede, as we must, that it is necessary to find some uniform definition of the word "lots" which will apply equally to all of the property included in all of these agreements, it is instantly apparent that it must be something different from the ordinary one of a subdivision of a block according to a plat or survey thereof, and in seeking a definition which can be applied uniformly to the entire district we find that the only thing which these tracts all had in common and in equal degree was lake frontage and riparian rights, and that this was the one thing which they did have in common which the park commissioners wanted. Some of these tracts had been surveyed and apparently some of them had not. Some of them went all the way through to Sheridan road and some of them went only as far back as Commonwealth avenue. Some of them were very deep and some of them were made up almost entirely of the accretions resulting from the improvement. Some of them required north and south frontage on the east and west streets and others required only the lake frontage for reasonable commercial use. Some of them would be excessively damaged by the construction contended for by appellants and others would not be harmed in the least. The only thing which they had which the park commissioners must have, and which they all had in common, was riparian rights, and these are exactly what the park commissioners acquired by these contracts.

Another aid in construing these agreements and determining the intention of the parties thereto is the manner in which the property has been used since the agreements were made and the construction which the parties them-

selves have placed upon them. Since its subdivision into smaller lots, as set forth early in this opinion, we find from the record that many dwelling houses and flat-buildings have been erected in this district with their frontage upon the east and west streets rather than upon the lake front. Two of these houses, with their lots, face south on Oakdale avenue, four face north on Wellington street, six face south on Wellington street, two face north on Barry avenue and one faces south on Barry avenue. It is also to be noted in this connection that these buildings have been erected without regard to the direction in which they face and directly contrary to the provisions of the agreements of 1904, if it is to be construed as the appellants contend. Those agreements provide: "That all buildings erected or constructed upon lots abutting on said boundary or dividing line to be established as hereinbefore set forth shall face said boundary or dividing line and the easterly wall or face of all such buildings shall be approximately parallel with said boundary or dividing line." Since the appellants' construction of the contract would have prohibited the building of all these houses facing north and south and would have prohibited the building of any houses facing westwardly toward Sheridan road upon all of this valuable property, and since the record fails to show any protest or litigation concerning these various buildings, it is a fair assumption that this case is the first one in which any such construction is attempted to be placed upon the contract in question. It is a familiar rule that courts will give great weight to a construction of a contract placed upon it by the parties themselves and by their acts or failure to act in connection with it. It is also to be noted in this connection that the release provisions of the agreement confer the power upon a majority, in frontage, of the lots which abut on and lie *immediately* west of the boundary line. We cannot ignore this word or fail to give it due meaning.

There is a remaining and conclusive reason which makes it impossible that the appellants' interpretation could have been contemplated by the parties in making the agreements of 1904. The plat shows that at the time the agreements were made the easterly frontage of the tract in question, as then defined by the existing lake shore, was from 75 to 150 feet west of the frontage or boundary to be created pursuant to and under the terms of that contract, and the creation of this new land and this new front or boundary was of the very essence of that contract and the very reason for its being made. By the performance of the agreements, and after they were signed by all of the parties, there was created a new and previously non-existent tract of land, varying in width from 75 to 150 feet and over a half mile long. The fee simple title to this new land vested in the owners of the riparian rights appurtenant to the old lake front, and none of this new land had ever been platted or surveyed or divided into lots or any other subdivisions.

It must be admitted that, subject to public regulations, the owners in fee could subdivide this tract as they might see fit and as in their own judgment might seem most suitable for their individual purposes, either alone or in conjunction with the property which they had previously owned. That power to subdivide must be conclusively presumed to have been in contemplation of the parties when they made the agreements, being a part of the law as it then existed. To sustain the appellants' contention it would be necessary to hold that the owners of this newly created land had no discretion in the matter of its division but were bound to divide it by arbitrarily extending such lines as designated their then existing boundaries. This we can not do. The construction which we place upon the word "lots" gives a full and reasonable meaning to all of the words in the agreements and makes clear and consistent with the rest of the instruments that clause which contains

the words "the then owner or owners of a majority, in frontage, of the lots which abut on and lie immediately west of the said westerly boundary line." In view of the accretions contemplated by the contract, those words could not by any possibility of reasonable construction be held to mean lots extending through to Sheridan road or Commonwealth avenue. We hold that the owners of this newly created land had the right to lay it out into lots as they might choose, and that it was the intention of the parties to the agreements of 1904 that the future owners of the lots thus created along the boundary line should have the power, acting through a majority of frontage, to join in and effectuate a modifying agreement. Under the construction which we place on the contract the owners of more than 1800 feet out of 2330 feet have signed the agreement of 1927, and it is therefore unnecessary for us to consider the title to the 18-foot strip in question, as it could not affect the result either way.

The appellants' remaining contention is, that the agreement of 1927 was not effectual to abrogate or modify the limitations and restrictions of the 1904 agreements, as follows: "That no building shall be erected on any lot or parcel of land bounded on the east by said boundary or dividing line of a greater height than 60 feet from the surface as herein fixed of the ground at the said boundary or dividing line to the highest point thereof, exclusive of chimneys." It is their argument that the release provision is in the same paragraph as the use restriction and that the height restriction is in a preceding paragraph. They point out that each section or portion of that part of the agreement which sets forth the covenants and agreements of the parties of the second part is indented, and contend from that method of printing that there are three separate and distinct paragraphs: (1) The paragraph requiring the buildings to face the boundary line; (2) a paragraph restricting the height; and (3) another paragraph

prohibiting the building of certain types of buildings for certain purposes and providing for the method of release or modification. In this contention they neither cite nor rely upon any authority other than the face of the document itself, the contention as to different subject matters dealt with in the so-called different paragraphs, and that in one of them a different territory—*i. e.,* a strip 150 feet wide—is described. It is our opinion that this construction would do violence to the plain intention of the parties, and we cannot concur in it.

The word "paragraph," as defined by Webster, is "a distinct part of a discourse or writing; any section or subdivision of a writing or chapter which relates to a particular point, whether consisting of one or many sentences." The courts have frequently held that "paragraph" is synonymous with "section," regardless of typographical arrangement. (*Marine* v. *Packhan,* 52 Fed. 579; *Alfrey* v. *Colbert,* 168 id. 231; *Barnes* v. *Stonebraker,* 28 Okla. 75, 113 Pac. 903.) We have frequently held that technical or grammatical construction must give way to the intention of the parties, and that the language used must be considered in the light of the surrounding circumstances. (*Loomis* v. *Collins,* 272 Ill. 221; *Eckhart* v. *Irons,* 128 id. 568; *Kearney* v. *Kirkland,* 279 id. 516.) In the *Loomis case,* which involved a building restriction, we said that even if it were doubtful whether the restriction was to be perpetual or to cease at the expiration of twenty years, the doubt must be resolved against the restriction. That statement would apply to this case.

We note in connection with the provision for the release of restrictions the following language: "Provided, however, that none of the *restrictions* or *prohibitions* in *this paragraph* contained shall be modified," etc. The construction contended for by the appellants would require us to ignore the word "restrictions" and give it no meaning

at all. There are no restrictions in that part of the document which the appellants claim constitutes a paragraph, but prohibitions, only. The restrictions occur in the first two subdivisions: First, a restriction on the direction which buildings may face; and second, a restriction as to the height of buildings. When the third subdivision is reached there are no restrictions, but only absolute prohibitions of certain types of buildings and the prohibitions of certain uses. Each of these sections ends with a semicolon, and, although separated from the one preceding by a slight indentation, they all follow the general italicized words, stating the entire agreement of the owners as to the use of their property. The contract itself refers to the fact that all of the property in the neighborhood is to be subjected to restrictions similar to those "in this paragraph set forth," and all of the contracts did contain all of these restrictions and prohibitions, and not merely those in the sub-paragraph in which the words "in this paragraph set forth" are found, and in which paragraphs are also found the provisions for release of restrictions. It is unreasonable to suppose that the parties would have wished to bind themselves irrevocably to a height restriction of 60 feet and at the same time be entirely willing to provide a means for the establishment of saloons, hotels, livery stables, road houses and the like. We find ourselves unwilling to accord such a narrow and technical construction to the word "paragraph" as the appellants contend for.

Finding no error in the record, the decree of the superior court of Cook county is affirmed.

*Decree affirmed.*